THE TEXAS PIPE LINE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59457. Promulgated February 20, 1935.

*Thomas K. Schmuck, Esq.,* and *James T. Dortsch, Esq.,* for the petitioner.

*J. R. Johnston, Esq.,* for the respondent.

OPINION.

VAN FOSSAN: This proceeding was brought to redetermine a deficiency in the income tax of the petitioner for the year 1927 in the sum of $51,374.26.

The issues are:

(1) Whether or not the Texas Co. (of Delaware), an affiliate of the petitioner, is entitled to deduct an allowance for the depletion of a sulphur mine based on the discovery value thereof created by its predecessor in title, also an affiliate of the petitioner.

(2) Whether or not the Texas Co. may deduct as an expense the sum of $315,518.52 representing the excess cost of certain stock pur-chased under an employees' stock allotment plan, above the allotment price to the employees.

The second issue was raised by the respondent upon his amended answer, an increased deficiency being claimed.

Counsel for the petitioner and respondent have stipulated by written agreement that the following constitutes a correct statement of facts. We adopt such stipulation as a portion of the facts pertinent to this proceeding:

(1) For the calendar year 1927, the Texas Corporation, a Delaware corporation, (hereinafter called the "Holding Company"), The Texas Company, a Texas corporation, (hereinafter called "Texas"), The Texas Company, a Delaware corporation, (hereinafter called "Delaware"), The Texas Pipe Line Company, a Texas corporation, (hereinafter called "the petitioner") and other corporations, filed a consolidated corporation income tax return and have been held by the Commissioner to have been affiliated for the period of operation of each of said corporations within said calendar year, under the provisions of section 240 of the Revenue Act of 1926.

(2) The tax, including any deficiency due from the above stated affiliated group for the year 1927, was allocated to the petitioner in accordance with an allocation agreement to such effect executed by each of the affiliated companies within the consolidation for said year, and accepted by the Commissioner, all in accordance with the provisions of section 240 of the Revenue Act of 1926.

(3) In the summer of 1926, the officers and directors of Texas, acting in concert with certain other shareholders thereof, concluded that it was desirable to reorganize the business of Texas in view of the difficulties theretofore encountered in managing and operating a corporation organized under the laws of the State of Texas.

The terms "reorganize" and "reorganization" are agreed to by the petitioner without regard to such peculiar meanings as may be attributed to them by the Revenue Act of 1926.

(4) After reaching the decision stated in paragraph (3) above, the said officers, directors and stockholders determined on a plan of reorganization which was carried out whereby (a) all the assets and liabilities of Texas as

a going concern were to be transferred to a corporation organized under the laws of a state more favorable than those of Texas, as respects the management and operations of corporations, and (b) the shares of that corporation to be organized were to be held by another corporation also to be organized as the Holding Company.

(5) The Holding Company was organized under the laws of Delaware on August 25, 1926. The Delaware Company was organized under the laws of Delaware on *January 24, 1927.*

(6) Between August 30, 1926 and April 12, 1927, the Holding Company by exchanging its stock, share for share, for shares of Texas, acquired more than 99 per centum of Texas' issued and outstanding capital stock and between said dates, the Holding Company acquired by subscription and payment of the subscription price all of Delaware's issued and outstanding capital stock of a total par value of $10,000. From April 12, 1927 to and including the dissolution of Texas, the Holding Company owned the stock of Texas mentioned in the preceding sentence. From April 12, 1927, to and including April 20, 1927, the Holding Company owned that stock of Delaware above mentioned in addition to other stock of Delaware acquired as hereafter set forth.

During the period from April 12, 1927, to the date of the dissolution of Texas (both dates inclusive), all of the capital stock of Texas was voting stock of one class, and during the period from April 12, 1927 to April 20, 1927 (both dates inclusive), all of the capital stock of Delaware was voting stock of one class.

(7) During the period from April 18, 1927 to April 20, 1927 (both dates inclusive), the same persons owned in the same proportions more than 99 per centum of the Holding Company's capital stock. On April 18, 1927, and at all times thereafter, all of the capital stock of the Holding Company was and has been voting stock of one class.

(8) As part of the plan pursuant to which the Holding Company acquired the stock mentioned in paragraphs (6) and (7) above, the Holding Company caused the following acts and things to be done on the dates mentioned below:

(a) On April 12, 1927, Delaware increased the amount of its authorized capital stock, and

(b) On April 12, 1927, the Holding Company offered, first, to subscribe for the entire amount of said increase in Delaware's capital stock and, second, to pay for the same by assigning to Delaware that liquidating dividend to which the Holding Company, as the owner of more than 99 per centum of Texas' issued and outstanding capital stock, was to be entitled on Texas' dissolution, and (c) on April 14, 1927, Delaware accepted the Holding Company's said offer to subscribe, and

(d) On April 19, 1927, Texas agreed to and did transfer to Delaware all its assets and liabilities for a consideration, which was the net book value of the same as shown by Texas' books and without the recognition of gain or loss to either party under the Revenue Act of 1926. Among the assets so transferred was such right, title and interest, if any, which Texas, as stated in paragraph (10) below, retained in and to that lease of mineral rights, mentioned in paragraph (9) below, of realty hereinafter referred to as Hoskins Mound. Insofar as concerned said right, title and interest, such net book value thereof was the cost to Texas thereof less allowances that were taken for depletion and depreciation, if any, and

(e) Pursuant to the agreement mentioned in subparagraph (d) above, the amount of the liquidating dividend assigned by the Holding Company to Delaware as aforesaid, was applied in payment of the cash consideration therein mentioned, and

(f) On April 19, 1927, the shareholders of Texas duly resolved that Texas should be dissolved, and

(g) On April 20, 1927, there was duly filed with the Secretary of State of the State of Texas, as required by the laws of said State, a certificate showing the due adoption of said resolution to dissolve Texas and on that day, the Secretary of State of the State of Texas issued a certificate showing that Texas had been dissolved.

(h) On May 2, 1927, the final liquidating dividend of Texas was paid to non-assenting stockholders in the sum of $1,732,536.

(9) In the year 1921, Texas acquired by lease the mineral rights in and to certain realty in Brazoria County, Texas, known and hereinafter referred to as "Hoskins Mound" and, thereafter, in that same year, discovered a sulphur mine in Hoskins Mound.

(10) Texas assigned and transferred to Freeport Sulphur Company its interest in and to the sulphur rights covered by said lease by instrument dated March 14, 1922 the material portions of which are as follows:

(a) Freeport Sulphur Company promised and agreed to pay to Texas, its successors and assigns, royalties based on the amount of sulphur mined from Hoskins Mound and sold,

(b) In event of Freeport Sulphur Company's failure to observe and perform any one of eighteen or more covenants on its part to be observed and performed, Freeport Sulphur Company's interest in said lease revested in Texas, its successors and assigns,

(c) Freeport Sulphur Company promised and agreed not to assign without the written consent of Texas, its successors and assigns, that interest by Texas assigned and transferred. Such interest, if any, reserved to and retained by Texas in said sulphur mine assigned and transferred to Freeport Sulphur Company, was among the assets of Texas when the transfer and conveyance of all of its assets was made to Delaware on April 19, 1927.

(11) For the period from January 1, 1927 to and including April 19, 1927, Texas, for the reasons stated above, was entitled to deduct from its net income for the year 1927, taxable under the Act, an allowance for depletion, based on the discovery value of said sulphur mine, at the rate of $2.075 per ton of sulphur mined therefrom and sold, or a total of $235,103.73.

"Discovery value" as used herein means that basis for depletion provided by section 204-C-1 of the Revenue Act of 1926.

(12) From and after April 19, 1927 to and including December 31, 1927, 258,178 tons of sulphur were mined from said sulphur mine and were sold.

(13) If Delaware is entitled to compute its depletion on the discovery value of said mine, then and in such case, Delaware is entitled to deduct from its net income for the year 1927 taxable under the Act, an allowance for depletion of said sulphur mine at the rate of $2.075 for each ton of sulphur mined therefrom and sold during the period from April 19, 1927 to and including December 31, 1927, or a total of $535,719.35. Such depletion, if allowed, is separate and distinct from that depletion allowance to which as stated in paragraph (11) above Texas is entitled.

(14) The cost to Texas of said sulphur mine was $633,000.

(15) The value and unit rates of depletion stated above are based upon a tonnage of 6,000,000 tons and a discovery value of $17,784,566.

(16) On the consolidated return for the calendar year 1927, the taxpayer claimed a deduction for depletion on sulphur at Hoskins Mound, Texas, in the sum of $999,808.92. The Commissioner, in computing the deficiency of $51,374.26 proposed in the 60-day letter attached to the petition allowed

total depletion on sulphur at said Hoskins Mound, Texas, in the sum of $619,258.83, without making any allocation of depletion allowable on discovery value or otherwise prior to April 19, 1927, inclusive and for the period April 20, 1927 to December 31, 1927.

(17) On or about May 17, 1927, the following plan was adopted by the Texas Company (Delaware):

"1. *Time and Basis of Allotment.*—From time to time during the continuance of this plan, employees of The Texas Company and its subsidiary corporations and affiliated corporations all the stock of which is owned by or held for The Texas Corporation will be given opportunity to purchase stock of The Texas Corporation. Allotments will be made to employees who at the date of allotment shall have been two years or longer in the active and continuous service of these companies exclusively, and they will be based ordinarily upon salary or wages earned during the year preceding allotment. The number of shares and the price will be fixed in each instance by the board of directors of The Texas Company. And the amount will be payable in monthly installments deductible from salary or wages.

" For the purpose of determining the right to stock allotments, neither temporary lay-offs ordered by the company resulting from shut-downs or lack of work nor periods of an employee's temporary illness will be deducted from the employee's time of service.

" The decision of the Board of directors shall be final and conclusive in regard to an employee's right to a stock allotment and the quantity thereof.

" Corporate officers, if not inactive, will be deemed employees for the purposes of this plan.

"An employee may, if he so desires, file with the company a written designation of a beneficiary or beneficiaries to whom stock may be issued and delivered in event of the employee's death before receiving the same. Such designation shall be subject to revocation or change by the employee at his discretion, the revocation or change to be in writing and filed with the company.

" 2. *Trustee—Power and Authority.*—Title to all stock taken by employees under this plan will be placed in a trustee designated by The Texas Company, and while the title so remains the trustee shall have full power and authority to vote upon the stock; to advance or borrow money for the purpose of paying for or carrying the stock, and to hold, pledge or hypothecate the stock to secure the repayment of such money with interest and other charges; to subscribe on behalf of employees but in the name of the trustee for shares of new issues of stock when the privilege of so subscribing may be accorded to stockholders as an incident to their stock ownership; to sell or otherwise dispose of subscription warrants or stock rights in such new issues for account of employee; and to exercise any or all of the powers herein enumerated in connection with every such new issue. But after an employee shall have paid up his stock in full, which may be done at any time, the same shall not thereafter be pledged or assigned by the trustee for any purpose. And any employee after so paying up his stock shall be entitled to receive promptly any dividends collected by the trustee thereon and the proceeds of any subscription warrants or stock rights sold by the trustee for account of such employee.

" 3. *Accounting.*—Employees will be charged on the books of the trustee with the amount or amounts owing by them respectively for stock. They will be credited with all payments received by the trustee for their respective accounts, including dividends so received and the proceeds of any subscription warrants or stock rights sold. Interest at the rate of six per cent per annum, computed quarterly, will be charged on debits and allowed on credits from the proper

dates. And where payments are refunded as provided for in succeeding clauses interest will be allowed at the same rate but in such cases employees will have no credit for dividends or subscription warrants or stock rights or the proceeds thereof.

"4. *Defaults.*—Failure of an employee to make or cause to be made any payment when due may, at the option of the trustee or the company, work a forfeiture of all right and claim to the stock, the employee thereupon becoming entitled to receive from the trustee a sum equal to the amounts theretofore actually paid by the employee with interest thereon.

"5. *Termination of Employment.*—Any employee ceasing to be such before becoming entitled to pay the balance, if any, owing by him and receive his stock certificate, and being no longer in the service of The Texas Company or any of its subsidiary corporations or affiliated corporations all the stock of which is owned or held for The Texas Corporation, whether such cessation be due to his own volition or to discharge (with or without cause), shall cease to have any right or claim to the stock but shall be entitled to receive from the trustee the amount of all payments actually made by him with interest thereon.

"6. *Death.*—Upon the death of an employee his estate or if a beneficiary has been designated, the person or persons so designated to receive the stock may pay to the trustee the unpaid balance of his indebtedness, and thereupon the estate or the person or persons designated to receive the stock will be entitled to receive forthwith from the trustee a stock certificate for the shares held for such employee, or at the election of the estate or the person or persons designated to receive the stock, in case such designation has been made by the employee, there will be paid over by the trustee to the estate or the person or persons designated to receive the stock the full amount actually paid in by the employee together with interest thereon.

"7. *Disability.*—In case of the total and permanent disability of an employee he or the person or persons designated to receive the stock may, if The Texas Company shall be satisfied in regard to the disability and its total and permanent nature, exercise the same rights as are extended to the estates of deceased employees in the immediately preceding clause.

"8. *Cancellation and Refund.*—At any time before acceptance of stock certificate an employee, or in case of his death his estate or the person or persons designated to receive the stock, may waive the right to stock and thereupon become entitled to receive from the trustee the amount of all payments actually made by such employee with interest thereon.

"9. *Three Years Restriction.*—Except as hereinbefore stated, no employee can obtain his stock certificate from the trustee until after the expiration of three years from the date when the stock is allotted to him, nor can he then unless and until payment in full has been made; and stock of any increase issue, subscribed for by the trustee for account of an employee, for the purpose of the three years restriction, shall be deemed allotted on the same date as the stock on account of which the right to the increase accrued.

"10. *No Fractions.*—Stock certificates will not be issued for fractional shares. Claims for fractional shares must be consolidated. This can be done by arrangement with the trustee or the trustee may dispose of fractions for account of employees.

"11. *Successors in Trust.*—The trustee or any successor in the trust may resign at will, or may be superseded at the will of the board of directors of The Texas Company, and thereupon in either event the board of directors by resolution may designate a successor, who shall succeed to all of the rights and powers of the original trustee, and this the board may do also in case of the death of any trustee.

" 12. *Discontinuance or Change of Plan.*—Nothing herein shall be construed as giving an employee a right to be retained in the service, and the company reserves the right at any time in its discretion to discontinue this plan, or to modify or change it in respect to future allotments."

Pursuant to the above plan Delaware and the Holding Co. and certain of the Holding Co.'s subsidiaries, on or about May 17, 1927, executed an agreement with T. J. Donoghue, as trustee, which agreement incorporated substantially all of the foregoing provisions. Among other provisions of the agreement were the following:

WHEREAS the Companies desire to create a trust as a part of a stock investment or profit sharing plan for the exclusive benefit of some or all of their employes, and are willing to make payments to the Trustee for the purpose of said trust; and

　*　　　*　　　*　　　*　　　*　　　*　　　*

1. That the Trustee will, from time to time, as directed by the Companies, purchase shares of stock of The Texas Corporation, a Delaware corporation which owns the stock of The Texas Company, for the purposes of said trust, at a price or prices agreed to by the Companies.

　*　　　*　　　*　　　*　　　*　　　*　　　*

4. That the Companies shall pay all of the expenses of administering this trust, and shall save the Trustee harmless by reason of any and every obligation he may enter into or assume pursuant to the terms of this agreement, and upon demand of the Trustee, shall advance him funds, by way of loan, with which to pay any and every obligation assumed by him hereunder. All amounts received by the Trustee from the sale of said stock shall be applied on the indebtedness of the Trustee incurred hereunder, including interest and other proper charges and whether owing to the Companies or others, until the same is fully discharged or cancelled.

5. That the Trustee, from time to time with the consent of the Companies, may sell said shares or any of them to others than the employes at a price or prices agreed to by the Companies, but all profits arising from such sales or otherwise arising in any manner in connection with the administration of this trust shall be held by the Trustee for the exclusive benefit of this trust, and the Companies shall not have the power to take for themselves title to any part of the corpus of this trust.

6. That the companies shall have the right at any time to terminate this trust, but in that event all the property affected thereby, after payment of the Trustee's indebtedness, shall be distributed to employes of the Companies, or some of them, in such manner and upon such terms as the Companies may prescribe, and the Companies shall in no event have the right to any part thereof.

7. Corporate officers, if not inactive, shall be deemed employes; but the decision of the board of directors of the companies shall be final and conclusive in regard to the rights of any particular employee in respect either to stock or proceeds of this trust.

　*　　　*　　　*　　　*　　　*　　　*　　　*

(18) During the year 1927 said T. J. Donoghue, acting under the aforesaid agreement, purchased stock of the Texas Corporation at $47.066 per share for the purpose of allotment to employees under the plan above stated. The sale price of this stock purchased as aforesaid to employees, under said plan, was during said year, fixed by the Board of Directors of the Delaware Company

at $40.00 per share, and said T. J. Donoghue, trustee, billed the Delaware Company for $315,518.52, which was arrived at in the following manner as shown by the accounts of the trustee:

Earnings:

| | |
|---|---:|
| Interest received | $334,445.03 |
| Excess dividends received overpaid | 57,316.50 |
| | $391,761.53 |

Deductions:

| | | |
|---|---:|---:|
| Interest paid | $277,854.95 | |
| Transfer tax paid | 204.98 | |
| Loss on stock sold to employees pursuant to allotment of July 1, 1927 | 429,220.12 | |
| | | 707,280.05 |
| Net amount billed | | $315,518.52 |

In the consolidated return of income for the year 1927, the Texas Company (Delaware), deducted said amount of $315,518.52 from income as an expense of doing business. The Commissioner in this proceeding has raised the affirmative issue that such amount is not an allowable deduction.

We find the following additional facts:

The sum of $315,518.52 was billed to the petitioner by the trustee and entered on its books as a loss " by reason of stock allotments under the Trustee plan." An account in the books of the Texas Co. captioned " Miscellaneous special T. J. Donoghue, trustee " was credited with the said amount and its " profit and loss suspension " account was debited with it.

The stock on which the above " loss " was incurred was purchased by the trustee to cover an allotment of shares to employees made as of July 1, 1927. For that year 84,486 such shares were allotted.

The said sum of $315,518.52 was paid by the Delaware Co. to the trustee during the year 1927.

The first issue is whether or not a corporation is entitled to compute depletion on the basis of the discovery value granted to its predecessor owner. The pertinent statutory provision is section 204 (c) (1) of the Revenue Act of 1926.[1] Under essentially similar facts we decided this question in the negative in *Rialto Mining Corporation*, 25 B. T. A. 980. See also *Darby-Lynde Co.*, 20 B. T. A. 522. The petitioner admits that these cases are indistinguishable, but argues that the cited cases are wrongly decided. The statute is explicit. The petitioner acquired proven property, valuable by reason of prior discovery. The facts reveal no basis for disregarding

---

[1] Sec. 204. (c) The basis upon which depletion, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the same as is provided in subdivision (a) or (b) for the purpose of determining the gain or loss upon the sale or other disposition of such property, except that—

(1) In the case of mines discovered by the taxpayer after February 28, 1913, the basis for depletion shall be the fair market value of the property at the date of discovery or within thirty days thereafter, if such mines were not acquired as the result of purchase of a proven tract or lease, and if the fair market value of the property is materially disproportionate to the cost * * *.

the separate corporate entities of petitioner and its predecessor in title. On the contrary, there are special reasons why the distinction should be preserved. The officials of the Texas Co. organized the Delaware company to supersede it in order to avoid certain burdens imposed on Texas corporations. Obviously, the benefits of such a procedure were deemed to outweigh the disadvantages. The loss of discovery value as a basis of depletion which would have been available to the predecessor is a disadvantage which must be accepted, along with the advantages which the Texas Co. has enjoyed through the revamping of its corporate structure. We see no reason to alter the conclusion reached in the cases cited and hence hold that the petitioner is not entitled to the benefits of the section relating to discovery value.

The second issue involves the deductibility of the cost to petitioner of maintaining a " stock investment or profit-sharing plan " by which part of its employees were permitted, through a trustee, to purchase stock in the Texas Co. at less than its fair market value. The petitioner deducted the sum in question in its return for 1927 and the Commissioner allowed it. It comes before us by virtue of an affirmative allegation in respondent's answer and a claim for an increased deficiency. The burden of proof is accordingly on the respondent.

The Board and the courts have been called on frequently to determine the deductibility of amounts paid under various forms of such plans. *Hibbard, Spencer, Bartlett & Co.*, 5 B. T. A. 464; *Haskell & Barker Car Co.*, 9 B. T. A. 1087; *Package Machinery Co.*, 28 B. T. A. 980; *Gardner Governor Co.*, 27 B. T. A. 1171; *William Ritter Lumber Co.*, 30 B. T. A. 231; *Robinson v. Commissioner*, 59 Fed. (2d) 1008. The plans involved in the cited cases differ in many respects, but substantially all present the same question, i. e., whether the amount in question constitutes an allowable deduction. Respondent argues on brief that it does not appear affirmatively that the purpose of the plan was the payment of additional compensation. We may properly observe that, as to this phase of the matter, the Commissioner having allowed the deduction, the presumption, if any arises, is that the deduction was proper and it is for the respondent to offer proof demonstrating that it was unallowable. This is not accomplished by merely raising a doubt or by pointing to the fact that there is no proof to sustain certain elements. Here the situation is the converse of that usually met, in which the petitioner carries the burden and must bear the consequences of absence of essential facts. In the instant situation the respondent undertook to prove that the item was not allowable. It was for him to introduce testimony, if such there be, proving that the purpose of the plan was not the paying indirectly of additional compensation to selected

employees. Similar observations apply as to his contention that the proof does not show that such additional compensation was reasonable. In answer it may be rejoined, the proof does not show that it was unreasonable.

Respondent urges that there was no sale of stock to the employees completed in 1927 and that the employees could not acquire the stock allotted in 1927 until the fulfillment of conditions impossible of performance in that year. It is to be remembered that the petitioner was on an accrual basis and, moreover, actually spent the money in question. The expenses were not all cost differential, but embraced other charges and costs incurred as a consequence of the plan. To withhold accounting for these items until the actual delivery of the stock in a later year would distort the true income condition. See *Haskell & Barker Car Co., supra.*

On the record before us we are unable to hold that the Commissioner has sustained the burden of proof in his claim for an increased deficiency.

*Decision will be entered under Rule 50.*