FLORENCE W. HUNT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56325. Promulgated April 29, 1937.

*Claude I. Parker, Esq., John B. Milliken, Esq.,* and *L. A. Luce, Esq.,* for the petitioner.

*P. A. Bayer, Esq.,* for the respondent.

1044

OPINION.

MELLOTT: The first question is whether or not petitioner is entitled to the personal exemption of $3,500 as the head of a family during the taxable years before us. The pertinent provision of the Revenue Act of 1926 and the regulations of the Treasury Department relating thereto are shown in the margin.[1] The corresponding provision of the Revenue Act of 1928 is section 25 (c) and the regulation interpreting this section is contained in article 292 of Regulations 74. In *Alfred R. Fuhlage*, 32 B. T. A. 222, this Board said:

Article 292 of Regulations 74, promulgated under the Revenue Act of 1928, is set forth in the margin. This portion of the regulations is not in conflict with the statute, but is a fair interpretation thereof. It, therefore, has the force and effect of law. *Maryland Casualty Co.* v. *United States*, 251 U. S.

---

[1] CREDITS ALLOWED INDIVIDUALS.

SEC. 216. For the purpose of the normal tax only there shall be allowed the following credits:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(c) In the case of a single person, a personal exemption of $1,500; or in the case of the head of a family or a married person living with husband or wife, a personal exemption of $3,500. A husband and wife living together shall receive but one personal exemption. The amount of such personal exemption shall be $3,500. If such husband and wife make separate returns, the personal exemption may be taken by either or divided between them.

[Treasury Regulations 69.] ART. 302. *Personal exemption of head of family.*—A head of a family is an individual who actually supports and maintains in one household one or more individuals who are closely connected with him by blood relationship, relationship by marriage, or by adoption, and whose right to exercise family control and provide for these dependent individuals is based upon some moral or legal obligation. In the absence of continuous actual residence together, whether or not a person with dependent relatives is a head of a family within the meaning of the statute must depend on the character of the separation. If a father is absent on business,' or a child or other dependent is away at school or on a visit, the common home being still maintained, the additional exemption applies. If, moreover, through force of circumstances a parent is obliged to maintain his dependent children with relatives or in a boarding house while he lives elsewhere, the additional exemption may still apply. If, however, without necessity the dependent continuously makes his home elsewhere, his benefactor is not the head of a family, irrespective of the question of support. A resident alien with children abroad is not thereby entitled to credit as the head of a family. As to the amount of the exemption, see article 301.

**1048**

342. This provision of the regulations is the same as corresponding provisions of prior and subsequent regulations, and the fact that Congress had continued to reenact, in the successive revenue acts, the provisions regarding the personal exemption of the head of a family, without change, is persuasive evidence of legislative approval of the regulation. *Brewster* v. *Gage*, 280 U. S. 327; *Helvering* v. *Bliss*, 293 U. S. 144.

The respondent contends that petitioner is not entitled to the exemption because she did not maintain a home during the years 1927 and 1928. The petitioner bases her claim to the exemption on the fact that she provided in full for the support of her son, Warner, during the years involved, and also helped to support her married son, John. Neither of said sons, however, was under 18 years of age or incapable of self-support because mentally or physically defective. (Sec. 216 (d), Revenue Act of 1926.)

The regulations provide that a parent is entitled to the exemption even though a child or other dependent is away at school or on a visit, if the common home is still maintained. In the instant case the evidence convinces us that during the taxable years petitioner was living in Cleveland, Ohio, in an apartment maintained by her sister. Petitioner introduced no evidence showing that she maintained a home during the taxable years, or that she contributed to the maintenance of the Cleveland apartment. Under these circumstances we must decide this issue for the respondent, for the maintenance of a home is essential to entitle her to the classification of the head of a family. Respondent did not err in disallowing the personal exemption of $3,500.

The remaining question is what amount of taxable gain, if any, was realized by petitioner when she sold the 6,000 shares of United preferred stock in 1927 for $540,000. To answer this question we must determine the basis which the stock had when sold.

Petitioner contends: (1) that she received 1,200 shares of Western by gift from her husband and that her basis for gain or loss on this stock was the amount he paid for it, or $70,250; (2) that she received another 1,200 shares of Western from her husband's estate by inheritance and that the basis for gain or loss on these shares was their fair market value at the time of her husband's death, or $240,000; (3) that in order to secure the stock from the bank where it had been pledged as security for her husband's loan, she paid the loan which, with accrued interest, amounted to $75,000, which payment should be treated as additional cost of the stock; (4) that she made a taxable exchange in December 1925 of the 2,400 shares of Western stock for stock of United, which had a fair market value of $600,000, and that she thus realized a taxable gain in 1925 of $215,000, which should be added to her basis; and (5) that in 1927, when she sold the 6,000 shares of United preferred stock for

$540,000 she realized no gain because the stock sold had a cost basis of $600,000 which was in excess of the amount realized on the sale. In the alternative, petitioner contends that even if the exchange in 1925 was not taxable, the cost basis should be $385,000, computed as follows:

Cost basis of shares individually owned_____ $70,000
Additional cost_____ 75,000
Cost basis of shares inherited_____ 240,000

The respondent contends that the original 1,200 shares of Western stock, which were acquired by petitioner as a gift, had the same cost basis they would have had in the hands of the donor husband, or $70,257; that as a result of the receipt of the stock dividend of 1,200 shares, the cost of the original 1,200 shares became the cost of the 2,400 shares; that petitioner did not receive 1,200 shares by inheritance; that having been the owner of 1,200 shares of stock when the stock dividend was declared, she was likewise the absolute owner of the 1,200 shares issued as a stock dividend, even though the certificate for those shares was issued in the name of her husband because of the fact that the original stock had not been transferred to her name on the books of the corporation; that the mere fact that through error the 1,200 shares were included in the estate tax return as an asset of the estate of her deceased husband and were taxed as such, does not change the legal ownership of the stock; that petitioner's cost basis should not be increased by the sum of $75,000, alleged to have been paid by petitioner to the bank; that the record shows that this $75,000 was a debt of her deceased husband paid by petitioner as the executrix of his estate; that the exchange by petitioner of her 2,400 shares of Western stock for 6,000 shares of common and 6,000 shares of preferred stock of United was a nontaxable transaction, and that the cost or other basis of the preferred stock of United sold in 1927 should be computed as follows:

| Class of stock | Shares received | Market value per share | Market value | Allocative percentage | Allocation of cost |
|---|---|---|---|---|---|
| | | | | *Percent* | |
| Preferred_____ | 6,000 | $89 | $534,000 | 68.99 | $48,470.30 |
| Common_____ | 6,000 | 40 | 240,000 | 31.01 | 21,786.70 |
| Total_____ | | | 774,000 | 100.00 | 70,257.00 |

Sale price of preferred_____ $540,000.00
Less allocated cost basis_____ 48,740.30

Capital net gain_____ 491,259.70

We shall first consider the events which occurred prior to the sale by petitioner of the stock in question, and determine what effect, if any, they had upon the cost or other basis of the stock sold.

The parties agree that Hunt acquired 1,200 shares of Western stock sometime prior to 1922 at a cost of $70,257. They also agree that he made a gift of this stock to petitioner in January 1922, although the stock remained in his name on the books of Western until sometime after his death. In discussing this transfer in *Estate of Warner D. Hunt, supra*, this Board said:

> * * * The fact that the assignment made by the decedent to his wife on January 13, 1922, constituted a complete and unequivocal transfer of title to the stock is fully supported by the evidence. It is none the less absolute because the donor retained or exercised some of the rights and privileges usually incident to stock ownership. *Estate of James F. Foster*, 13 B. T. A. 496. Nor does the failure to have such stock transferred on the books of the company impair the validity of the transfer. *Estate of James F. Foster, supra; George W. Dulany, Jr. et al.*, 17 B. T. A. 486. See also *Ewalt v. Ames*, 6 Ohio App. 374; *McCoy v. Gosser*, 8 Ohio App. 145.

Having received the 1,200 shares of Western stock as a gift after December 26, 1920, petitioner's basis for gain or loss was the same as that of her donor, or $70,257. (Sec. 204 (a) (2), Revenue Act of 1926.)

At the time petitioner received the 1,200 shares of Western stock as a gift from her husband, it was in the possession of a bank as collateral security for his obligations, aggregating approximately $55,000. She authorized the bank to continue to hold it as security; but all recognized that she was the absolute owner of it, subject only to the payment of the amount owing by her husband. The question of the ownership of these shares is no longer in dispute; for it was definitely settled by the decision of this Board in *Estate of Warner D. Hunt*. But the effect of the issuance of the stock dividend upon the basis of this stock must be determined.

Respondent in his answer to the amended petition affirmatively alleges that the dividend stock did not belong to Hunt at the time of his death and that it was not an asset of his estate. He alleges that he erred in determining that the value of such stock at the time of Hunt's death, or $240,000, was the proper basis for determining the profit realized by petitioner when the shares were sold in 1927 and that the proper basis for gain or loss upon such sale is $35,128.50.

It is well settled that the burden of proof rests upon the party who asserts the affirmative of the issue or question in dispute. Having made the affirmative allegation, the respondent had the burden of proving that Hunt was not the owner of the dividend stock at the time of his death but that it was the personal property of peti-

tioner. *Clark Dredging Co.*, 23 B. T. A. 503; affd., 63 Fed. (2d) 527; *Clifford Hemphill*, 25 B. T. A. 1351; *Security First National Bank of Los Angeles, Executor*, 28 B. T. A. 289; *Alexander D. Falck*, 26 B. T. A. 1359; affd., 71 Fed. (2d) 656; certiorari denied, 293 U. S. 608; *Texas Pipe Line Co.*, 32 B. T. A. 125 (on appeal, Third Circuit). Cf. *Tex-Penn Oil Co.* v. *Commissioner*, 83 Fed. (2d) 518; affd., *Helvering* v. *Tex-Penn Oil Co.*, 300 U. S. 481. We are of the opinion and hold that the respondent has not sustained his burden of proof.

The evidence discloses that when the 100 percent stock dividend was declared in December 1922, Hunt being the record owner of the original 1,200 shares which he had given to his wife, received the dividend stock and deposited it with the bank as security for the payment of his loans. It also appears that after the gift of the original shares some cash dividends were paid to Hunt on those shares. He deposited the checks therefor in the joint account maintained by him and petitioner and reported the amounts received as part of his income. After Hunt's death, petitioner received cash dividends upon the dividend stock and reported them as income of the estate.

The dividend stock remained in Hunt's name from the time of its issuance in 1922 until his death in September 1924, or almost two years. It might be that petitioner could have compelled him to turn over to her both the cash dividends and the dividend stock; but she did not attempt to do so. Perhaps even after his death, petitioner, either in a special proceeding in the probate court (see sections 10728 *et sequa*, Page's Annotated Ohio General Code), or in the estate tax proceeding before this Board, could have established the fact, if it was a fact, that both the cash dividends and the dividend stock belonged to her rather than to her husband. The fact that she did not attempt to do so is a strong circumstance indicating that she did not consider herself to be the owner of them. Possibly she had made a gift of them to her husband; or perchance she may have assumed that he was entitled to receive them, either because of his prior ownership of the gift stock or because of some agreement made at the time of the gift. We do not know; and the evidence is not very satisfactory upon this point. We are satisfied, however, that petitioner acquiesced in the appropriation of the cash dividends and the dividend stock by her husband. Apparently the respondent shared this view when the ownership of the 1,200 shares of the original issue was in controversy before this Board in the estate case, *supra;* for in that proceeding he admitted that the dividend stock was an asset of the estate and received an estate tax thereon which would not have been due if petitioner had been the owner of the stock.

Under the circumstances we think that respondent has not sustained his burden of proof merely by showing that petitioner was the owner of the original shares of stock and that she may have had a beneficial interest in the dividend stock. We conclude that respondent has failed to show that he erred in determining that the dividend stock had a value of $240,000 when received by this petitioner as residuary legatee under her husband's will. We accordingly hold that said basis was correctly used by respondent in computing petitioner's capital net gain upon the sale of the stock in 1927. (Sec. 204 (a) (5), Revenue Act of 1926.)

The next question is whether or not the $75,000 which petitioner paid, being the $55,458 note of her deceased husband with accrued interest, may be added to her basis for the 1,200 shares of stock received by her as residuary legatee. We think not. The debt was an obligation of the estate. Petitioner was not legally liable for its payment. If she had chosen to do so she could have sold some of the property of· the estate, including the shares of stock pledged as collateral security for its payment, in which event both the value of, and hence the basis of, the property which she would have received as residuary legatee would have been lessened. She, however, adopted the practical plan of making a voluntary payment of an obligation which could not be enforced against her to the end that she might thus receive securities having a value of $240,000 and thereby also secure the release of her own shares of stock having an equal value. But she did not thus become a purchaser of the stock belonging to her husband's estate nor may the sum so expended be considered as part of the cost of such stock to her. The property was acquired by petitioner as the residuary legatee of her husband and its basis to her is the fair value—no more and no less—at the time of such acquisition. We accordingly hold that the $75,000 may, not be added to such basis.

The next contention of petitioner is that she made a taxable exchange of the 1,200 shares of Western common stock which she owned and of the 1,200 shares owned by the estate for preferred and common stock of United and that she realized a profit of $215,000 which should be added to the basis for gain or loss of the stock received in the exchange. Respondent contends that the exchange was made pursuant to a plan of reorganization, that hence it was nontaxable, and that petitioner's cost basis on the stock received in the exchange continued to be the same as that of the stock transferred. In this connection he is claiming that the basis is $70,257, being the cost of the original 1,200 shares; but the combined basis of the 2,400 shares will be discussed later.

Section 203 (b) (2) of the Revenue Act of 1926 provides that "no gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock ·or securities in such corporation or in another corporation a party to the reorganization."

Section 203 (h) (1) of the same act provides that "the term 'reorganization' means (A) a, merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock in another corporation)." The evidence shows that United acquired all of the stock of Western. There was, therefore, a reorganization within the meaning of the parenthetical clause above set forth. It is unnecessary to decide or discuss whether or not the subsequent acquisition by United of all of the assets of Western resulted in a complete merger or consolidation. The acquisition by United of all of the stock of Western partook of the nature of a merger or consolidation. A strict merger or consolidation is not one of the essentials of a statutory reorganization. *Helvering* v. *Minnesota Tea Co.*, 296 U. S. 378.

The other requirements of section 203 (b) (2), *supra*, namely, that there be a plan of reorganization and that both corporations be parties to the reorganization, are met in the instant proceeding. The plan of United to acquire all of the stock of Western was a plan of reorganization. Western and United were both parties to a reorganization as that term is defined in section 203 (h) (2) of the Revenue Act of 1926, for the term "a party to a reorganization" includes both corporations in the case of an "acquisition by one corporation of at least, a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation."

Petitioner invites our attention to the fact that Western continued its corporate existence. It is now well settled that the dissolution of a corporation is not essential to a reorganization. *Helvering* v. *Minnesota Tea Co.*, *supra*. Prior to the exchange petitioner and the other stockholders of Western owned stock in that corporation. Subsequent thereto they held in place of such stock, stock in United, which gave them a substantial and continuing interest in the affairs of that corporation.

It is our conclusion that the exchange of petitioner's Western stock for preferred and common stock of United was a nontaxable exchange within the meaning of section 203 (b) (2), *supra*, and that the basis for gain or loss which formerly attached to the Western stock continued to be petitioner's basis on the preferred and common

stock of United received in the exchange. Sec. 204 (a) (6), Revenue Act of 1926.[2]

We have heretofore determined that the cost basis for the 1,200 shares of stock which we have found petitioner acquired from the estate of her deceased husband is $240,000. There remains for determination the cost basis of the shares which she received as a gift, in which connection we must decide whether such basis is $70,257 or $35,128.50. We are of the opinion that it is the latter sum. The cost of the 1,200 shares was $70,257. When the 100 percent dividend was declared the $70,257 then became the cost of the 2,400 shares. If petitioner had received the dividend shares and had given them away it could not be gainsaid that the shares retained by her had a cost basis of only $35,128.50. While we have not found that she did receive them, and that she thereafter made a gift of them to her husband, the effect of her failure to insist that the dividend stocks be issued to her as the legal owner of the original stocks was the same, so far as her basis is concerned, as it would have been if she had received them and given them to her husband. We accordingly find that the basis was, as determined by the respondent, $35,128.50.

The sole undetermined issue is whether the allocation of cost between the preferred and common stock of United was correctly made by the respondent or whether petitioner's theory should be adopted. Petitioner contends that the exchange was consummated between December 17, 1925, the date of the offer, and December 22, 1925, when the offer expired; that in December 1925, the United preferred had a value of $100 per share while the United common had no fair market value; that the cost or other basis of the 2,400 shares of Western should not be allocated between the preferred and common of United but became the basis of the preferred; that she is therefore entitled to a basis of $600,000 for the preferred, and having sold it in 1927 for $540,000, actually sustained a loss measured by the difference between said amounts.

---

[2] SEC. 204 (a). The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property; except that—

*          *          *          *          *          *          *

(6) If the property was acquired upon an exchange described in subdivision (b), (d), (e), or (f) of section 203, the basis shall be the same as in the case of the property exchanged, decreased in the amount of any money received by the taxpayer and increased in the amount of gain or decreased in the amount of loss to the taxpayer that was recognized upon such exchange under the law applicable to the year in which the exchange was made. If the property so acquired consisted in part of the type of property permitted by paragraph (1), (2), (3), or (4) of subdivision (b) of section 203 to be received without the recognition of gain or loss, and in part of other property, the basis provided in this paragraph shall be allocated between the properties (other than money) received, and for the purpose of the allocation there shall be assigned to such other property an amount equivalent to its fair market value at the date of the exchange. This paragraph shall not apply to property acquired by a corporation by the issuance of its stock or securities as the consideration in whole or in part for the transfer of the property to it.

Respondent contends, and we have found as a fact that in January 1926 the preferred had a fair market value of $89 per share and the common had a fair market value of $40 per share. These are the values upon which the respondent determined the deficiency, and they are supported by evidences of actual purchases and sales made by a firm of New York brokers during the month of January. This firm made numerous purchases and sales during that month and the lowest price at which the common stock was sold was $78.50 on January 5. The lowest price paid for United preferred was $89.50 on January 11. Approximately 3,000 shares of United common were sold by this firm during the month of January. One of petitioner's witnesses testified that he tried to purchase United common in January 1926 for $20 a share but was unable to do so as the price asked at that time was $70 a share. This and other evidence in the record convinces us that the values of $89 a share for United preferred and $40 a share for United common, as found by the respondent, were quite conservative.

Section 204 (a) (6) of the Revenue Act of 1926 provides, in effect, that where stock is acquired upon an exchange without the recognition of gain or loss, the basis of the property given up in the exchange shall be allocated between the properties—classes of stock—received, "and for the purpose of the allocation there shall be assigned to such other property an amount equivalent to its fair market value at the date of the exchange." If, therefore, the exchange was consummated in January 1926, the allocation as made by the respondent should be approved.

In support of her contention that the date of the exchange was December 1925 instead of January 1926, as found by the respondent, petitioner points out that she testified she signed the acceptance of the offer about the middle of December. She did so testify; and inasmuch as there is no evidence to the contrary, we accept that as a fact. But was the exchange then complete? We think not. The offer which petitioner accepted specifically provided that the United stock would not be delivered until after January 2, 1926, and the evidence clearly indicates that petitioner received it in that month and not in December of 1925.

An exchange has been defined as "a mutual transfer of one or more pieces of property for property other than money." 23 C. J. 184. "An exchange is an executed contract; it operates, *per se*, as a reciprocal conveyance of the thing given, and of the thing received in exchange." *Preston* v. *Keane*, 39 U. S. (14 Pet.) 132, 137. Cf. *Elisha Roper*, 7 B. T. A. 1112; *Florence G. Baldwin*, 23 B. T. A. 512; and *Edgar Stanton et al., Executors*, 34 B. T. A. 451, on appeal to the Seventh Circuit. While the acceptance of the offer by petitioner in December 1925 constituted a valid contract to make an exchange, there

was no "mutual transfer" or "executed contract" until the United stock was delivered to petitioner, which occurred in January 1926. We accordingly hold that "the date of the exchange" as used in section 204 (a) (6), *supra*, was January 1926; and, having found that the fair market value of the stock at that date was as determined by the respondent, it follows that he did not err in allocating the cost of the Western stock between the preferred and common stock of United in the manner set out in the original notice of a deficiency and as shown in our findings of fact.

It follows that the deficiency as originally determined by the respondent should be and it hereby is approved. His claim for an increased deficiency, however, is disallowed.

> *Judgment will be entered that there is a deficiency of $36,293.79 for the year 1927 and a deficiency of $296.05 for the year 1928.*