**PHILADELPHIA AND READING CORPORATION and Southern Carbon Corporation**

v.

**The UNITED STATES.**

No. 592–77.

United States Court of Claims.

July 18, 1979.

---

Michael F. Duhl, Chicago, Ill., for plaintiffs; Charles W. Davis, Chicago, Ill., atty. of record. Lawrence M. Dubin and Hopkins, Sutter, Mulroy, Davis & Cromartie, Chicago, Ill., of counsel.

Bruce W. Reynolds, Washington, D.C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D.C., for defendant; Theodore D. Peyser, Jr., and Robert S. Watkins, Washington, D.C., of counsel.

Before NICHOLS, KUNZIG and BENNETT, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge:

Plaintiffs, Philadelphia and Reading Corporation (P&R) and Southern Carbon Corporation, seek to recover overpayments of federal income taxes and interest for the taxable years 1958 and 1959. The case, which is before the court on cross-motions for summary judgment, involves a question of first impression of whether a corporation which is a transferee of mining property in a transaction described in the Internal Revenue Code, 26 U.S.C. § 351 (1976)[1] is entitled to amortize development expenses which the transferor incurred with respect to such property and elected to defer under 26 U.S.C. § 616(b) (1976).[2] We conclude that such a transferee is so entitled and hold for plaintiffs.

P&R was, prior to January 1, 1958, engaged in the business of mining, processing, distributing, buying, and selling anthracite coal. In the course of conducting these operations, P&R incurred costs for the development of the coal properties, principally for the removal of overburden for stripmining operations, which are agreed to be costs of the type described in section 616. From January 1, 1956, Reading Anthracite

1. I.R.C. § 351(a) provides:

"No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property."

2. I.R.C. § 616(b) provides:

"At the election of the taxpayer, made in accordance with regulations prescribed by the Secretary, expenditures described in subsection (a) paid or incurred during the taxable year shall be treated as deferred expenses and shall be deductible on a ratable basis as the units of produced ores or minerals benefited by such expenditures are sold. In the case of such expenditures paid or incurred during the development stage of the mine or deposit, the election shall apply only with respect to the excess of such expenditures during the taxable year over the net receipts during the taxable year from the ores or minerals produced from such mine or deposit. The election under this subsection, if made, must be for the total amount of such expenditures, or the total amount of such excess, as the case may be, with respect to the mine or deposit, and shall be binding for such taxable year."

Company, P&R's subsidiary, carried out these activities for which Reading Anthracite received a fee from P&R. P&R elected to defer the deduction of these expenses under section 616(b), and amortize them on a ratable basis as coal from the mine was sold.

On January 1, 1958, P&R transferred all of the properties connected with its coal business to Reading Anthracite[3] in exchange for 7,000 shares of common stock and securities in the amount of $10 million secured by a mortgage on the real property. Both before and after the transaction, P&R owned more than 99 percent of the outstanding stock of Reading Anthracite. Under section 351, no gain was recognized on the transfer.

P&R and Reading Anthracite filed a consolidated federal income tax return for 1958 in which Reading Anthracite claimed a deduction of $1,081,469 for amortization of the deferred development expenses incurred by P&R. In a separate return for 1959, Reading Anthracite claimed additional amortization of P&R's deferred development expenses of $653,889.[4] Such deductions were disallowed.

**I**

Prior to 1951, a taxpayer involved in the exploration and development of mining[5] properties was required to capitalize all exploration and development costs and to include such amounts in the basis of the mineral properties as part of the cost of acquiring such properties. Since a taxpayer is required to take the higher of cost or percentage depletion,[6] and percentage depletion is based on the concept of a percentage of gross income from a mineral property rather than the recovery of cost of a mining property, these expenditures were, in effect, never recovered if percentage depletion was used. Congress in 1951, wishing to foster and stimulate mining activity, provided for different treatment for some exploration costs[7] and all development costs.

Section 616 [formerly section 23(cc) of the Internal Revenue Code of 1939] provides that a taxpayer may currently deduct development costs as incurred or elect to defer such costs. The election is available year by year and mine by mine. I.R.C. § 616(b). Where deferred, these costs are amortized when production commences as mineral units benefited by such costs are produced and sold. A taxpayer can only defer so much of his development costs which exceed the net receipts of the mine or deposit in that year.

Deferred costs are included in the cost basis of the mineral property for purposes of gain or loss upon the sale, exchange, disposition, or abandonment of the property to the extent that they have not been previously deducted. I.R.C. §§ 616(c), 1016(a)(9). For purposes of depletion, however, deferred costs are not included in the adjusted basis, so that cost depletion is calculated without considering deferred costs, and

---

3. Reading Anthracite Company thereafter changed its name to Reserve Carbon Corporation and on April 1, 1966, was merged into plaintiff Southern Carbon Corporation. Thus, Southern Carbon is the successor in interest of Reading Anthracite. More than 99 percent of the stock of Southern Carbon is owned by P&R.

4. P&R, as the parent of an affiliated group filing a consolidated return, is the plaintiff representing Reading Anthracite for the taxable year 1958. Southern Carbon, the successor in interest of Reading Anthracite, is the plaintiff for the taxable year 1959.

5. Mining, as that term is used in the Code, includes all minerals, notably hard minerals, except for oil and gas.

6. Cost depletion is the recovery of cost on the basis of production with an equal amount of cost being allocated to each mineral unit. Percentage depletion is a percentage of gross income from a mineral property limited by 50 percent of the taxable income from that property.

7. Originally, a taxpayer was permitted to either expense (take current deductions) or defer, capitalize, and amortize over production exploration costs up to $75,000 per year for 4 years. Internal Revenue Code of 1939, § 23(ff) [1954 I.R.C. § 615]. Though section 615 governed the treatment of exploration costs in the tax years in dispute, such treatment is now exclusively governed by I.R.C. § 617.

both cost or percentage depletion allowed reduce only the depletion basis without affecting the deferred development expense account.

Both expensed and deferred development costs can affect the amount of percentage depletion on a mining property. These costs, to the extent deducted in a particular year, are taken into consideration in determining the taxable income from the property. Hence, since percentage depletion is limited to 50 percent of taxable income, I.R.C. § 613(a), these expenses can materially reduce the allowance for percentage depletion.

## II

Nowhere in section 616 is there a clue to the treatment of development costs when a taxpayer is a transferee of a mining property from a transferor who previously incurred development costs with respect to that property. The legislative history to the original act, S.Rep. No. 781, Part 2, 82d Cong., 1st Sess. 21–22 (1951), however, provided:

> This amendment is applicable to a taxpayer who has paid or incurred expenditures of the type described therein and accordingly has no application to that part of the cost of a mine or deposit attributable to such expenditures when acquired by purchase. Where a taxpayer has paid or incurred expenditures described in subsection (cc), has made an election under paragraph (2), and has thereafter leased the developed property retaining a royalty interest therein, such a taxpayer shall be allowed the ratable deduction provided in paragraph (2).

Certainly, a transferee who acquires a mineral property through a sale, taxable exchange, or nontaxable like-kind exchange under I.R.C. § 1031 is a purchaser within the intendment of this section. In each case, the transferee's total cost of the mineral property (in the case of a section 1031 exchange, the allocation would be of the transferee's substituted basis in the acquired asset) can be properly allocated to the individual assets acquired on the basis of their respective fair market values. The development activity is a valuable asset to which an allocation could be made. Congress, however, prevented such a transferee from treating the cost properly allocated to development expenditures as an asset separate from the cost of the minerals themselves and amortizing them in addition to the higher of cost or percentage depletion. This prohibition not only prevented section 616 treatment for the cost of development expenditures which had been deferred and not yet deducted by the transferor, but the cost of development expenditures which had been expensed or already amortized. To a purchaser of the type described above, it makes no difference whether the transferor had any basis in the development expenditures.

A transferee described in sections 351 or 368,[8] however, is unlike the transferee described above because its tax investment (basis) in a mineral property is not determined by its cost (or its "tax cost" in the case of a like-kind exchange) but by the transferor's tax cost or investment (*i. e.,* basis). I.R.C. § 362. Though a transferee does exchange its stock or securities for the mineral property, the transferor has not made a new investment but merely changed the form of the old. Both sections 351 and 368 are the result of statutory recognition of the mere change in form of legal ownership without a substantial change in the substance of the transferor's investment. Thus, transferees described in sections 351 or 368 acquire the property at the transferors' adjusted basis under I.R.C. § 362(a) (section 351 exchange) or I.R.C. § 362(b) (section 368 exchange), and, therefore, they only have basis in those development expenses which the transferors have not previously expensed or amortized. Thus, it is readily apparent that in terms of the question as to whom Congress wished to restrict

---

**8.** I.R.C. § 368 provides for the tax-free transfer of property for stock pursuant to corporate reorganizations described in that section.

the benefits of section 616, transactions covered by sections 351 or 368 present a much different situation than normal purchase transactions. Defendant contends, however, that a section 351 transferee is a purchaser within the intendment of the legislative history. Defendant argues that when section 23(cc) was enacted in 1951, the term purchaser had a well-established meaning in natural resources tax law, presumably known to Congress, which included a transferee described in section 351 or 368.

Prior to 1954, a taxpayer was permitted to use the "discovery value" of certain kinds of mineral deposits (the number having been substantially reduced over the years) as his basis for depletion. Effective in 1951, section 114(b)(2) of the Internal Revenue Code of 1939 provided:

> In the case of mines (except mines in respect of which percentage depletion is allowable under paragraph (4) of this subsection), discovered by the taxpayer after February 28, 1913, the basis for depletion shall be the fair market value of the property at the date of discovery or within thirty days thereafter, if such mines were not acquired as the result of purchase of a proven tract or lease, and if the fair market value of the property is materially disproportionate to the cost.
> * * *

Both judicial and administrative interpretation of this section reached the conclusion that discovery value depletion was not available to a transferee described in what are now sections 351 and 368. *See Texas Pipe Line Co. v. Commissioner,* 32 B.T.A. 125 (1935), *aff'd,* 88 F.2d 278 (3d Cir.), *cert. denied,* 302 U.S. 706, 58 S.Ct. 26, 82 L.Ed. 545 (1937); *Rialto Mining Corp. v. Commissioner,* 25 B.T.A. 980 (1932); *Darby-Lynde Co. v. Commissioner,* 20 B.T.A. 522 (1930), *aff'd,* 51 F.2d 32 (10th Cir. 1931); G.C.M. 15215, XIV–2 C.B. 162 (1935); G.C.M. 2817, VI–2 C.B. 23 (1927). The authorities recognized that two requirements had to be met to satisfy the statute: the taxpayer had to be the discoverer and the taxpayer could not be a purchaser of a proven tract. In *Darby-Lynde,* the board held that the transferee resulting from the incorporation of a partnership in a transaction described in section 351 was not the discoverer of the minerals and was a purchaser. The Tenth Circuit affirmed on both grounds. In *Texas Pipe Line Co.,* the board applied the same doctrine to a transaction described in section 368. The Third Circuit, however, affirmed only on the single ground that a section 368 transferee was not the discoverer. *See also Rialto Mining Corp. v. Commissioner, supra,* 25 B.T.A. at 984 (section 368 transferee not a discoverer). Though the only interpretation extant in 1951 was that discovery value depletion was not available to a transferee described in sections 351 and 368, the courts did not uniformly hold that a 351 or 368 transferee was a purchaser for purposes of the statute.[9]

Though defendant's argument, by itself, has some merit, there is other, better evidence of the scope of section 616 as intended by Congress. For, also in 1951, Congress changed the treatment of exploration expenses as well. Internal Revenue Code of 1939, § 23(ff) [Internal Revenue Code of 1954, § 615]. The Senate committee reports accompanying section 23(ff) contain the exact same provision denying such treatment to purchased exploration costs as found concerning development expenses. S.Rep. No. 781, Part 2, 82d Cong., 1st Sess. 64 (1951). Because of the limited nature of the allowance to defer or expense exploration costs, however, Congress included in the statute that a transferee described in sections 351 and 368 could not elect to defer or expense exploration costs to the extent that the transferor had already done so. This provision was meant to prevent the circumven-

---

**9.** Discovery value depletion was replaced by percentage depletion which imposed no limitations on transferees or purchasers. Recently, however, in the case of percentage depletion for oil and gas, Congress has specifically denied percentage depletion to a transferee of a proven tract. I.R.C. § 613A(c)(9)(A). A section 351 transferee is allowed such depletion if the limitations on the amount of depletion imposed by that section are allocated between the transferor and transferee. I.R.C. § 613A(c)(9)(B)(ii).

tion of the limits imposed by the statute by a formal transfer of ownership. Though neither the statute nor the legislative history explicitly stated that such transferees were not purchasers, such is the only logical reading of the statute for otherwise the transferee at the same time would be limited by the transferor's election but unable to treat the costs incurred by the transferor in the manner the transferor's election required. When Congress reenacted section 23(ff) as part of the 1954 Code, however, the committee report made clear that a section 351 or 368 transferee was not a purchaser in equating the transferee's independence from the transferor's election with the status of being a purchaser.

> As under existing law, the benefits of a prior election are not available to a purchaser of a mineral property, and in such cases any deduction taken or election exercised by the vendor may be disregarded by the taxpayer in applying the 4-year limitation. [S.Rep. No. 1622, 83d Cong., 2d Sess. 337 (1954), *reprinted in* [1954] U.S.Code Cong. & Admin.News, pp. 4621, 4977.]

Thus, we conclude that Congress did not intend that the language "cost of expenditures * * * acquired by purchase" included the carryover basis by which a transferee determines its investment in property acquired in a section 351 transaction.

Treating the transferee in the same manner as the transferor in a section 351 or 368 transfer for purposes of section 616 fits within the general treatment afforded such transferees in the Code. As part of the Internal Revenue Code of 1954, Congress enacted I.R.C. § 613(c)(3) which included for the first time a provision allowing percentage depletion on the recovery of minerals from the waste or residue of mines. The subsection specifically provided that it did not apply "to any such extraction of the mineral or ore by a purchaser of such waste or residue or of the rights to extract ores or minerals therefrom." I.R.C. § 613(c)(3). In this case, however, the Senate report specifically defined what it meant by the term purchaser:

> * * * For purposes of section 613(c)(3), the word "purchaser" does not apply to a person who acquires the whole mine property, including such waste or residue, in a tax-free exchange (e. g., through a tax-free corporate reorganization) from a person who was entitled to depletion upon such waste or residue. * * * [S.Rep. No. 1622, 83d Cong., 2d Sess. 333, *reprinted in* [1954] U.S.Code Cong. & Admin.News, pp. 4621, 4973.]

Similarly, the transferee steps into the shoes of the transferor pursuant to a section 351 or 368 exchange under I.R.C. §§ 47(b) (recapture of investment credit upon early disposition), 1245 (recapture of depreciation deductions on personal property), 1250 (recapture of depreciation deductions on real property), 1254 (recapture of intangible drilling costs, the counterpart in oil and gas to development costs in mining). Further, there are several other sections of the Code which turn on questions of whether a transferee is a purchaser, and in these cases a section 351 transferee is not a purchaser. See I.R.C. § 334(b)(3); Treas.Reg. § 1.48–3 (1967); Treas.Reg. § 1.179–3(c)(1) (1972).

The correctness of this result is seen clearly by a comparison of the treatment of deferred development expenses under sections 351 and 368. In 1954, Congress enacted I.R.C. § 381 to give statutory authorization for the carryover of certain tax attributes in some types of corporate reorganizations described in section 368. Section 381(c)(10) permits the transferee to continue to amortize the transferor's deferred exploration and development expenses under sections 615 and 616.

Defendant cites the fact that the regulation under section 616 allows only one exception to the purchaser qualification by referring to section 381. See Treas.Reg. § 1.616–1(b)(4) (1960). Upon turning to the regulations under section 381, however, it is apparent that section 381 was not meant to be an exclusive section for determining whether tax attributes can be carried over to a transferee corporation. Treas.Reg. § 1.381(a)–1(b)(3) (1975). This regulation is

merely a restatement of the view expressed in the committee reports. S.Rep. No. 1622, 83d Cong., 2d Sess. 277 (1954), *reprinted in* [1954] U.S.Code Cong. & Admin.News, pp. 4621, 4915; H.R.Rep. No. 1337, 83d Cong., 2d Sess. A135 (1954), *reprinted in* [1954] U.S.Code Cong. & Admin.News, pp. 4017, 4273. As to at least the carryover of one corporate attribute, the installment method of accounting under section 381(c)(8), the Treasury itself has recognized that such an attribute is carried over to a section 351 transferee. Treas.Reg. § 1.453–9(c)(2) (1976).

The carryover of corporate attributes listed (or not listed) in section 381(c), pursuant to a transaction described in section 351, is largely an uncharted area. Some would certainly be required while others would be entirely incompatible with the special rules surrounding section 351, and the nature of the transferor and the transaction. Continued amortization of deferred development expenses by the transferee is entirely compatible with section 351, however. Two factors demonstrate that the treatment of transferees under either section 351 or 381(a) in respect to the transferors' deferred development costs should be the same. The transferees have the same basis in those costs as the transferors. The amortization deductions can only be taken by the transferees over production of the minerals actually benefited by the development costs.

Lastly, the essence of defendant's case is not that the carryover of such costs has tax avoidance possibilities, but simply that Congress made a choice between the taxpayer who actually incurred the expenses and a separate legal entity through which the taxpayer continues to operate the business. This rationale, however, does not support differing treatment for transferees described in section 381(a) versus those described in section 351. Thus, we conclude that Congress did not intend to restrict the application of section 616 to those costs acquired as a result of formal changes in ownership.[10]

---

10. Plaintiffs also argued that this result is mandated by the consolidated return regulations. Treas.Reg. § 1.1502–1 *et seq.* (1966). Because

## CONCLUSION

 In view of all of the circumstances, we hold that I.R.C. § 616 permits a transferee of a mineral property described in I.R.C. § 351 to treat deferred development expenses in the same manner as if it were the transferor. Accordingly, defendant's motion for summary judgment is denied, plaintiff's cross-motion is granted, and the case is remanded to the trial division for proceedings under Rule 131(c) to determine the amount of recovery.

of the disposition of this case in favor of plaintiff on other grounds, we find that it is unnecessary to deal with this point.