ORIE R. KELLY AND GRACE V. KELLY, HUSBAND AND WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 79959.   Promulgated September 8, 1937.

*Russell D. Morrill, Esq.*, and *Francis L. Casey, Esq.*, for the petitioners.

*F. L. Van Haaften, Esq.*, for the respondent.

### OPINION.

MELLOTT: The petitioners, who are husband and wife, residing at White Plains, New York, filed a joint return of income for the year 1932. Therein they deducted as a capital net loss $2,606.25, claimed to have been sustained in connection with the surrender by Orie R. Kelly of one-half of the stock owned by him in the County Trust Co. of New York under the circumstances hereinafter related. Inasmuch as the transactions which will be discussed herein were all carried out by Orie R. Kelly, he will be referred to as the petitioner.

The Commissioner disallowed the claimed capital net loss in the amount of $2,606.25, added to the net income shown on the return $2,700 as dividends received by petitioner on his shares of stock in the County Trust Co. of New York and determined a deficiency in tax for the year 1932 in the amount of $795.64.

In making the above determination respondent determined as a fact, and now contends, that a distribution which was made by the County Trust Co. in October 1932, was made at such time and in such manner as to make it essentially equivalent to the distribution of a taxable dividend to the extent of $661,339.31. (Sec. 115 (g), Revenue Act of 1932.)[1] Petitioner having received his aliquot portion of said sum, amounting to $2,700, said sum was added by the respondent to, and he contends that it is taxable as a part of, petitioner's income.

Petitioner contends that the distribution of cash and stock of the County Improvement Corporation was made in connection with a reduction of the capital stock of the County Trust Co. in exchange for the surrender of one-half the number of shares held by him as a stockholder of the Trust Co., that the transaction was a partial liquidation under the statutes (section 115 (h), Revenue Act 1932)[2], that it was not made at such time and in such manner as to make it essentially equivalent to the distribution of a taxable dividend, and that a capital net loss was sustained in the amount of the excess of the cost of that part of the stock surrendered by him—a portion of such stock being a capital asset within the meaning of section 101 of the Revenue Act of 1932—over the amount of cash and the fair market value of the Improvement Corporation stock which he received. Respondent contends in the alternative that even if it should be found that the cash received by the petitioner is not taxable to the extent of the available earned surplus still it must be found that petitioner did not sustain a recognizable loss on the transaction. The contentions will be considered in the order stated.

The proceeding was submitted upon a stipulation of facts, certain documentary evidence and the testimony of three witnesses. We find the facts to be as stipulated and from the whole record we set out herein the facts deemed by us to be especially pertinent to the issues to be decided.

The County Trust Company of New York (hereinafter referred to as the Trust Company) was incorporated under the banking laws of the State of New York and commenced business on or about

---

[1] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

(g) Redemption of Stock.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

[2] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

(h) Definition of Partial Liquidation.—As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.

February 22, 1926. Since that date it has been engaged in the general banking business in New York City. As a result of a merger with another company its name has since been changed.

Upon its organization, the Trust Company issued its entire authorized capital stock of $1,000,000, consisting of 10,000 shares of the par value of $100 per share for cash at $150 a share. Of the $1,500,000 received on the issuance of said stock $1,000,000 was credited to the capital stock account and $500,000 was credited to the paid-in surplus account.

From the time of its formation in 1926, its business and earnings steadily increased. In 1929 there was a large demand for money on call loans at high rates of interest and it was expected that it could employ additional capital profitably under these circumstances. Accordingly, on or about February 15, 1929, the capital stock of the Trust Company was increased to $4,000,000, consisting of 40,000 shares of a par value of $100 per share. The increase of 30,000 shares over and above the previously outstanding 10,000 shares was issued and sold for $200 cash per share. Of the $6,000,000 received as the result of the issuance of said 30,000 shares, $3,000,000 was credited to the capital stock account and $3,000,000 to the paid-in surplus account.

On or about November 19, 1930, the number of shares of the Trust Company was changed from 40,000 shares of $100 par value to 160,000 shares of $25 par value, the total capital remaining unchanged at $4,000,000. At the time of the increase of the number of shares and the reduction of the par value, the stock was selling at a high price and the change was made to give the stock greater marketability and wider distribution. As a result of this reduction in the par value of the stock, the number of stockholders in the bank was increased.

On or about April 24, 1929, the County Improvement Corporation was organized under the laws of the State of New York with an authorized capital stock of 1,000 shares of no par value. By October 20, 1932, the authorized and outstanding capital stock of said corporation had been increased to, and consisted of, 40,000 shares of no par value, all of which were owned by the Trust Company. The cost of this stock in cash to the Trust Company was $1,100,000. On October 20, 1932, in addition to the aforementioned capital stock held by the Trust Company, said Improvement Corporation was indebted to the Trust Company in the amount of $1,100,000, secured by a bond and first mortgage on the land and the twenty-story County Trust Building located at Eighth Avenue and Fourteenth Street, in New York, N. Y., owned by the County Improvement Corporation.

The fair market value of the voting trust certificates (hereinafter mentioned) for capital stock of the County Improvement Corpora-

tion during the period from October 20, 1932, to November 1, 1932, both inclusive, was $12 per share.

In December 1930, the president of the Trust Co. reported to its board of directors that the Trust Company's policy regarding future dividends deserved serious consideration. He reported that an analysis of the earnings and expenses for the eleven months ending November 30, 1930, disclosed a decided downward trend in the gross and net earnings, resulting in net earnings of approximately $31,000 monthly at the end of that period as compared with earnings of twice that amount at the beginning of the period; that the decrease in earnings might be traced to three factors; a decrease in deposits, a decrease in the rates of interest on invested assets, and an increase in non-earning assets. The president concluded that an increase in earnings could not be looked for at that time since an increase in deposits was improbable on account of the general business depression; that higher rates of interest available would mean a change in the policy of investing the liquid funds in a class of items which would not be immediately liquid or which would have elements of greater risk than the present investments, and that it was unwise to sacrifice the then liquid position of the company merely for the sake of increasing its earnings; that it was also impossible materially to reduce operating costs. The president recommended that the dividend rate on the Trust Company's $25 per share par value stock be reduced to $1.20 per share a year. This dividend would be equivalent to $4.80 per share of $100 par value, as compared with the $8 per share paid prior to the reduction to $25 per share. The directors passed a resolution that a quarterly dividend of 30 cents per share be paid on the new stock in accordance with the president's recommendation.

Due to the general depression, the business and earnings of the Trust Company continued to decline. At the end of 1931 and during the first six months of 1932 the earnings were so unsatisfactory, considering the amount of capital the Trust Company was employing, that its president concluded that action should be taken to relieve the company of capital funds which it was unable to employ profitably in its business. In 1932 the Trust Company had about twice as much capital in relation to deposits as the average of all banks in New York State reported by the State Superintendent of Banks for 1931. The president discussed the proposed reduction of capital informally with the directors, with other bankers, and with the Superintendent of Banks of the State of New York, and all were of the opinion that the Trust Company had twice as much capital as was necessary.

The president, on or about September 14, 1932, recommended to the board of directors of the Trust Company that a 50 percent

reduction in capital stock was desirable. He therefore recommended that there be returned to the Trust Company one-half of the stock held by the stockholders, they to be paid part in cash and part in Improvement Corporation stock. The Improvement Corporation stock was to be distributed rather than cash in order to preserve the liquid condition of the bank for the protection of depositors. At a special meeting held on September 14, 1932, the board of directors of the Trust Company adopted the president's recommendations.

Thereafter the stockholders and directors of the corporation took the necessary action to reduce the capital stock of the Trust Company from $4,000,000, consisting of 160,000 shares of the par value of $25 each, to $2,000,000, consisting of 80,000 shares of the par value of $25 each, and to distribute to the stockholders the $2,000,000 by which the capital stock was reduced. The transaction was reflected upon the Trust Company's books as follows:

Credit to County Improvement Company stock_____ $1,100,000.00
Setting up a credit to pay cash distribution_____ 800,000.00
By transfer to paid-in surplus_____ 100,000.00

Total reduction in stock 80,000 shares at $25.00 per share_ $2,000,000.00

The stockholders were required to surrender their certificates of County Trust stock for new certificates equal to 50 percent of the number of shares represented by the certificates surrendered, and $10 in cash and voting trust certificates representing one-half share of Improvement Corporation stock for each share retired and cancelled. On November 1, 1932, the petitioner, Orie R. Kelly, surrendered his certificates for 540 shares of Trust Company stock and, in accordance with the change in capital structure effected October 20, 1932, received (1) certificates for 270 shares of Trust Company stock, (2) voting trust certificates for 135 shares of County Improvement Corporation stock which had a fair market value of $12 per share, or $1,620, and (3) $2,700 in cash.

Prior to the change in the capital structure effected on October 20, 1932, the Trust Company had outstanding $4,000,000 of capital stock consisting of 160,000 shares of a par value of $25 each which were held by approximately 600 stockholders.

The certificate of reduction of the capital stock of the Trust Company, and the certificate showing the approval thereof by the Superintendent of Banks, were filed in the Office of the Secretary of State of New York on October 20, 1932. On October 21, a letter was sent to the stockholders of the Trust Company requesting the surrender of their certificates in exchange for new certificates representing one-half as many shares of Trust Company stock, and cash and voting trust certificates of Improvement Corporation stock as above set out, and the exchanges contemplated therein were duly made.

On October 20, 1932, the petitioner, Orie R. Kelly, owned 540 shares of the Trust Company stock, the date of acquisition and the cost thereof being as reflected in the following schedules:

| Date Purchased | No. of Shares Par Value $100 | Price per Share | Total Cost |
|---|---|---|---|
| 7/30/30 | 10 | $230.00 | $2,300.00 |
| 10/23/30 | 9 | 179.50 | 1,615.50 |
| 10/24/30 | 10 | 182.50 | 1,825.00 |
| 10/24/30 | 5 | 180.00 | 900.00 |
| 11/ 8/30 | 5 | 176.00 | 880.00 |
| 11/11/30 | 4 | 165.50 | 662.00 |
| 11/11/30 | 10 | 170.50 | 1,705.00 |
| 11/12/30 | 47 | 160.50 | 7,543.00 |
| Totals | 100 | | $17,430.50 |

On November 25, 1930, the 100 shares of $100 par value stock set out above were exchanged for 400 shares of $25 par value stock, and subsequent purchases were made so that on October 20, 1932, petitioner owned 540 shares which had cost him $21,060.50, as shown below:

| Date Purchased | $25 Par Value | Price per Share | Total Cost |
|---|---|---|---|
| 11/25/30 | 400 by exchange | | $17,430.50 |
| 12/11/30 | 20 | $40.25 | 805.00 |
| 12/23/30 | 20 | 40.25 | 805.00 |
| 12/29/30 | 60 | 25.00 | 1,515.00 |
| 7/15/32 | 15 | 17.00 | 255.00 |
| 7/25/32 | 25 | 10.00 | 250.00 |
| Totals | 540 | | $21,060.50 |

The Trust Company stock did not constitute petitioner's stock in trade nor was it property of a kind which would properly be included in his inventory if on hand at the close of the taxable year, nor property held by him primarily for sale in the course of his trade or business.

The fair market value of the capital stock of the Trust Company, as disclosed by quotations reported in the Commercial and Financial Chronicle, was as follows:

| | Bid | Asked | |
|---|---|---|---|
| October 8 to 14, 1932 | 19½ | 21½ | (old stock) |
| October 15 to 21, 1932 | 19½ | 21½ | (old stock) |
| October 15 to 21, 1932 | 29 | 31 | (new stock) |
| October 22 to 28, 1932 | 19¼ | 21¼ | (old stock) |
| October 22 to 28, 1932 | 29½ | 31½ | (new stock) |
| October 28 to Nov. 1, incl | 29½ | 31½ | (new stock) |

At October 20, 1932, the market value of the investment securities held by the Trust Company, exclusive of County Improvement Corporation stock, was approximately $2,000,000 less than the amount at which such securities were carried on the books. A reserve for depreciation of securities of $1,080,578.84 was carried on the books at October 20, 1932, and said reserve was increased by $1,000,000 on April 13, 1933. This reserve was used on April 13, 1933, to write the securities down to market value.

The following is a schedule of dividends paid by the Trust Company since its organization to October 20, 1932:

| Year | Amount |
|---|---|
| 1926 | None |
| 1927 | None |
| 1928 | None |
| 1929 | $80,000 |
| 1930 | 288,000 |
| 1931 | 192,000 |
| 1932 prior to October 20 _____ $144,000 | |
|     subsequent to October 20 _____ 48,000 | |
| | 192,000 |
| 1933 | 192,000 |

No stock dividends were issued by the company prior to October 20, 1932.

At all times between October 20, 1932, and November 1, 1932, the Trust Company had earnings or profits available for dividends in the amount of $661,339.31.

Petitioner, in his return of income for the year 1932, deducted a claimed capital net loss of $2,606.25 on the four purchases made prior to November 8, 1930, explaining it under Schedule D as the difference between the cost of County Trust Co. shares, stated to be $3,320.25 and the amount realized, stated to be $714, which represented 68 shares surrendered at $10 per share, plus 34 voting trust certificates valued at $1 per share. He now contends that he sustained a capital net loss of $4,464.50 and an ordinary loss of $10,432, or a total loss of $14,896.50, which he explains in his brief as follows:

There was no identification of the lots or certificates for shares cancelled. The following schedule shows the various lots of stock acquired at different times and different prices, the amount received for each lot making up the 270 shares cancelled on the basis of the "first in, first out" rule (*Allington v. Commissioner*, 31 B. T. A. 421) and the loss calculated under Section 111 (a):

| Date Purchased | Number of Shares | | Cost | Amount Received at $16 per share | Loss |
|---|---|---|---|---|---|
| | Bought | On 4-1 Split | | | |
| 7/30/30 | 10 | 40 | $2,300.00 | $640 | $1,660.00 |
| 10/23/30 | 9 | 36 | 1,615.50 | 576 | 1,039.50 |
| 10/24/30 | 10 | 40 | 1,825.00 | 640 | 1,185.00 |
| 10/24/30 | 5 | 20 | 900.00 | 320 | 580.00 |
| | 34 | 136 | $6,640.50 | $2,186 | $4,464.50 |
| 11/8/30 | 5 | 20 | 880.00 | 320 | 580.00 |
| 11/11/30 | 4 | 16 | 662.00 | 256 | 406.00 |
| 11/11/30 | 10 | 40 | 1,705.00 | 640 | 1,065.00 |
| 11/12/30 | 47 | ¹ 188 | 7,543.00 | 928 | 8,381.00 |
| | 66 | 134 | $10,790.00 | $2,144 | $10,432.00 |
| | 100 | 270 | $17,430.50 | $4,320 | $14,896.50 |

¹ Surrendered 58 shares.

Petitioner held 136 shares for more than two years prior to the exchange on November 1, 1932, and since they qualified otherwise as capital assets under the definition of section 101 (c) (8), petitioner is entitled to the deduction of a loss of $4,464.50 sustained on the exchange thereof in accordance with Sections 23 (r) and 101, all of which is recognizable under Section 112. The loss on shares which did not qualify as capital assets under Section 101 amounted to $10,432.

We agree with petitioner's contention that the transaction shown in the above facts, most of which were stipulated, were not, as determined by the respondent, "essentially equivalent to the distribution of a taxable dividend", and hence taxable, in whole or in part, under section 115 (g) of the revenue act shown *supra*. The section has been discussed in many court and Board decisions and it is now well established that it is the duty of the Commissioner, in the first instance, and of this Board and the courts in the second, to scrutinize all transactions in which a distribution is made by a corporation to its stockholders, accompanied by a reduction of stock, and determine whether or not the particular one discloses such facts as call for the application of the section now under consideration. A few of such cases are *Henry B. Babson*, 27 B. T. A. 859, affd., 70 Fed. (2d) 304; certiorari denied, 293 U. S. 571; *Commissioner* v. *Cordingley*, 78 Fed. (2d) 118; *George O. Rockwood*, 31 B. T. A. 927, affd., 82 Fed. (2d) 359, and *McGuire* v. *Commissioner*, 84 Fed. (2d) 431, affirming 32 B. T. A. 1075; certiorari denied, 299 U. S. 591.

It has been said, and we believe correctly, that the section was "aimed at capitalizations of earnings which had no fair business object but were intended merely to evade the payment of taxes." *Commissioner* v. *Quackenbos*, 78 Fed. (2d) 156. There has been no such showing here. This Board and the courts have uniformly held that sums paid in retirement of stock are not taxable as dividends, unless the retirement was made in pursuance of a plan formed at the time when the stock was originally issued, or as a cloak for the distribution of earnings. *Henry B. Babson, supra; Commissioner* v. *Quackenbos, supra; Commissioner* v. *Cordingley, supra; George O. Rockwood, supra.*

In the instant proceeding the retirement of the Trust Company stock was not made pursuant to any plan formed when it was originally issued, nor as a cloak for the distribution of earnings. The corporation was engaged in the general banking and trust business and had about 600 stockholders. It had never issued any stock dividends, and, except for the first three years of its existence, cash dividends were paid regularly commencing in 1929 and continuing through 1933. In 1929, when there was an increasing demand for loans and the opportunity for large earnings therefrom, its capital was increased from $1,000,000 to $4,000,000. The stock market crash

in November, 1929, and the general business depression which followed, resulted in a decline in its business earnings. As a result it was compelled to reduce the amount of the regular dividend from $8.00 per share to $4.80 per share of $100 par value. In 1932, when the ratio of its capital to deposits was more than twice as high as the average for all banks in New York State, it decided to relieve itself of capital for which there was no profitable use, and to reduce its capital from $4,000,000 to $2,000,000. This was done; but the cancellation and redemption of the stock was not made "at such time and in such manner" as to be "essentially equivalent to the distribution of a taxable dividend." The respondent's determination that it was such a distribution is not approved.

We are not impressed with the argument advanced by respondent in support of his contention that the cash distribution was to the extent of the earned surplus from earnings of the Trust Company and taxable as a dividend. His argument that the corporation never intended to stop business or liquidate its stockholdings was effectively answered by the Circuit Court of Appeals for the Second Circuit in *Commissioner* v. *Quackenbos, supra*, wherein that court stated that section 115 (c) nowhere limits distributions such as those here involved to payments made in the course of winding up a corporation, and that a redemption of a part of a corporation's stock need not necessarily relate to a winding up of its business.

There remains for our consideration respondent's alternative contention that in the event we decide, as we have, that the distribution in question was not essentially equivalent to a distribution of a taxable dividend under section 115 (g) of the Revenue Act of 1932, petitioner did not sustain any recognizable loss on the transaction. As to this contention we think the respondent is correct. Although the Trust Company reduced its outstanding capital stock by exactly one-half, it did not distribute to its stockholders a like proportion of its assets. Not only did it not distribute any of its paid-in or earned surplus, but it actually increased its paid-in surplus to the extent of $100,000. Furthermore, petitioner and the other stockholders of the Trust Company retained the same proportionate interest in such paid-in and earned surplus after the reduction of the capital stock as they had before the reduction took place. Under such circumstances, we think the alleged loss claimed by petitioner was not in fact realized as he still owned the same proportionate interest in the undistributed assets as he had before. In our opinion, the alleged loss should be added to and be considered as a part of the basis of the remaining stock of the Trust Company, the benefit of which, petitioner will receive when he in some future year disposes of such remaining stock. See *Hellman* v. *Helvering*, 68 Fed. (2d) 763; *Charles M. Haft*, 20 B. T. A. 431; and *Bed Rock Petroleum Co.*, 29 B. T. A. 118. Cf. *Commissioner* v.

*Wright*, 47 Fed. (2d) 871; and *Florence M. Quinn*, 35 B. T. A. 412.

Petitioners rely principally upon the two cases of *John B. Williams*, 28 B. T. A. 1279, and *Alfred E. Fuhlage*, 32 B. T. A. 222; appeal dismissed, 79 Fed. (2d) 998. In the *Williams* case both parties agreed that the distribution there of $400,000 was a distribution in partial liquidation and the only question left for the Board to decide was whether the said liquidating dividend was in payment for 1,083 shares of stock or 1,666 shares. In the *Fuhlage* case it was held, as we have held here, that the distribution was not essentially equivalent to the distribution of a taxable dividend. The additional finding was made that the amount which was paid to the taxpayer constituted an amount distributed in partial liquidation of the company; but no such finding is justified under the facts now before us. As pointed out *supra* there was not *in fact* "a partial liquidation of a corporation." No part of the surplus or undivided profits account of the Trust Company was distributed to the stockholders. On the contrary, such account was augmented through the contribution by the stockholders of $100,000 to it.

The transaction not having resulted in the realization of a recognizable loss, it follows that the respondent did not err in disallowing the claimed deduction.

*Judgment will be entered under Rule 50.*