ALFRED E. FUHLAGE, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 61754.    Promulgated March 12, 1935.

*Stanley S. Waite, Esq.*, for the petitioner.
*T. M. Mather, Esq.*, for the respondent.

OPINION.

McMahon: The Beacon Paper Co. in 1929 redeemed and canceled $200,000 par value of its capital stock, paying cash therefor. The petitioner surrendered to the company 1,213⅓ shares of stock, receiving from the company in payment therefor $121,333.33. This was stock which the petitioner had purchased from Louis Alt in

1927 at a cost of $101.59 per share or $123,252.53. The respondent held that the payment of the amount of $121,333.33 to the petitioner in 1929 was the equivalent of a taxable dividend under section 115 (g) of the Revenue Act of 1928. The petitioner contends that the amount received by him in redemption of such stock was not the equivalent of a taxable dividend, but was a payment in partial liquidation of the company, and that the distribution is controlled by section 115 (c) of the Revenue Act of 1928. There are set forth in the margin applicable provisions of the Revenue Act of 1928.[1]

We agree with the contention of the petitioner. On September 22, 1920, the company increased its authorized capital stock from $100,000 to $500,000 by capitalizing $400,000 of the earned surplus and issuing additional common stock of $400,000. The balance sheets of the company at the end of the years 1919 and 1920 indicate that during the year 1920 the company did not have cash or its equivalent sufficient to pay a cash dividend even approximating $400,-000. The declaration of the stock dividend was pursuant to a plan to capitalize some of the surplus to make it available to take care of increased business and for the purpose of going into the wrapping paper business. The company was already in the business of dealing in fine paper, such as is used by printers. The stipulated facts show that in order to care for its increased business and in order to enter the wrapping paper business, additional capital would be required for the purpose of carrying larger inventories and for the purpose of purchasing an additional warehouse. Due to the depression of

---

[1] SEC. 115. DISTRIBUTION BY CORPORATIONS.

\*     \*     \*     \*     \*     \*     \*

(c) *Distributions in liquidation.*—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. In the case of amounts distributed in partial liquidation (other than a distribution within the provisions of section 112 (h) of stock or securities in connection with a reorganization) the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits within the meaning of subsection (b) of this section for the purpose of determining the taxability of subsequent distributions by the corporation.

\*     \*     \*     \*     \*     \*     \*

(g) *Redemption of stock.*—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend. In the case of the cancellation or redemption of stock not issued as a stock dividend this subsection shall apply only if the cancellation or redemption is made after January 1, 1926.

(h) *Definition of partial liquidation.*—As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.

1921, in which year the company sustained a loss of $154,975.60, thereby impairing its capital to the extent of $68,668.83, the matter of going into the wrapping paper business and the purchase of a new warehouse was deferred. In 1922 the company made a profit, but its capital still remained impaired. However, in 1923 the company made a substantial profit and resumed the payment of dividends and again considered the matter of expanding its business and purchasing a warehouse, but no definite action was taken. The business did not improve after 1921 to the extent anticipated and the amount invested in merchandising during each year subsequent to 1921 was approximately $200,000 less than the amount invested in merchandise as of December 31, 1920. Thereafter the matter of expansion was frequently considered, but in 1929 the company definitely determined not to go into the wrapping paper business or to purchase a warehouse. In 1929 it was determined that the company did not need all of its capital for successful operations and that it could be successfully operated and conducted with a capital of $300,000. Thereupon, in that year, the capitalization was reduced from $500,000 to $300,000 by the redemption of stock as heretofore pointed out.

In our opinion, the evidence of the reasons for the declaration of the stock dividend in 1920 and the subsequent redemption and cancellation of a part thereof nine years later, in 1929, is sufficient to show that there was no continuing plan to distribute corporate earnings by means of a distribution made in connection with cancellation or redemption of stock rather than by the declaration of ordinary dividends. It should be noted that from 1923 to 1929 the company did declare substantial cash dividends. If there had been such a continuing plan it is reasonable to suppose that the petitioner, being one of the principal stockholders, would have known thereof. The fact that in 1927 he purchased 1,516⅔ shares of stock in excess of its par value tends to show that there was no such plan; otherwise his purchase of the stock would have been an unreasonable act.

From a consideration of all the stipulated facts it is clear to us that the cancellation or redemption of the stock was not "at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend" within the meaning of section 115 (g) of the Revenue Act of 1928. This proceeding is governed in principle by the authorities cited by the petitioner. *Pearl B. Brown, Executrix*, 26 B. T. A. 901; affd., *Commissioner* v. *Brown*, 69 Fed. (2d) 602; certiorari denied, 293 U. S. 579; *Robert R. Meyer*, 27 B. T. A. 44; and *Henry B. Babson*, 27 B. T. A. 859; affd., *Commissioner* v. *Babson*, 70 Fed. (2d) 304; certiorari

denied, 293 U. S. 571. To the same effect is *T. Pierre Champion*, 27 B. T. A. 1312. See *Alfred A. Laun*, 26 B. T. A. 764. We hold that the amount of $121,333.33 paid to the petitioner upon the surrender of his stock constituted an amount distributed in partial liquidation of the company, within the meaning of section 115 (c) and (h) of the Revenue Act of 1928.

It has been stipulated by the parties that the 1,213⅓ shares of stock surrendered by the petitioner in 1929 was a part of that which petitioner had purchased in 1927 for $101.59 per share. The cost of such stock to the petitioner was $123,252.63. The total cost of the stock to the petitioner is the basis for the determination of gain or loss. Sec. 113 (a), Revenue Act of 1928.[2] Thus the petitioner sustained a deductible loss upon the surrender of the stock in the amount of the excess of the basis over the amount realized, or $1,929.20. Sec. 111 (a), Revenue Act of 1928.[3]

The petitioner, who is a single man, contends that the respondent erred in denying him a personal exemption of $3,500 as the head of a family under the provisions of section 25(c) of the Revenue Act of 1928.[4]

Article 292 of Regulations 74, promulgated under the Revenue Act of 1928, is set forth in the margin.[5] This portion of the regulations is not in conflict with the statute, but is a fair interpretation thereof. It, therefore, has the force and effect of law. *Maryland Casualty Co.* v. *United States*, 251 U. S. 342. This provision of the regulations is the same as corresponding provisions of prior and subsequent regulations,[6] and the fact that Congress has continued to reenact, in the successive revenue acts, the provisions regarding the personal exemption of the head of a family, without

---

[2] SEC. 113. BASIS FOR DETERMINING GAIN OR LOSS.

(a) *Property acquired after February 28, 1913.*—The basis for determining the gain or loss from the sale or other disposition of property acquired after Febuary 28, 1913, shall be the cost of such property; except that—[exceptions not material here].

[3] SEC. 111. DETERMINATION OF AMOUNT OF GAIN OR LOSS.

(a) *Computation of gain or loss.*—Except as hereinafter provided in this section, the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the basis provided in section 113, and the loss shall be the excess of such basis over the amount realized.

[4] SEC. 25. CREDITS OF INDIVIDUAL AGAINST NET INCOME.

There shall be allowed for the purpose of the normal tax, but not for the surtax, the following credits against the net income;

\*      \*      \*      \*      \*      \*      \*

(c) *Personal exemption.*—In the case of a single person, a personal exemption of $1,500; or in the case of the head of a family or a married person living with husband or wife, a personal exemption of $3,500. \*  \*  \*

[5] ART. 292 [Regulations 74]. *Personal exemption of head of family.*—A head of a family is an individual who actually supports and maintains in one household one or more individuals who are closely connected with him by blood relationship, relationship by marriage, or by adoption, and whose right to exercise family control and provide for these dependent individuals is based upon some moral or legal obligation. \*  \*  \*

[6] Article 302 of Regulations 69 (1926), 65 (1924), Regulations 62 (1921), and 45 (1918) ; and article 292 of Regulations 77 (1932).

change,[7] is persuasive evidence of legislative approval of the regulation. *Brewster* v. *Gage*, 280 U. S. 327; *Helvering* v. *Bliss*, 293 U. S. 144.

In the instant proceeding the evidence shows that during the year in question the petitioner actually supported and maintained in his household his unmarried sister, age 55 years. In our opinion, the petitioner's right to exercise family control and provide for his dependent sister was based upon a moral obligation. He was her sole support. She had no trade or occupation and had no income. It is our conclusion that the petitioner is entitled to a personal exemption of $3,500 as the head of a family. *Paul Polichroniades*, 2 B. T. A. 1263.

*W. E. Massey*, 14 B. T. A. 407, affirmed in *Massey* v. *Commissioner*, 51 Fed. (2d) 76, is distinguishable. There we held the taxpayer was not entitled to an exemption as the head of a family where his sister, 43 years of age, lived with him and supervised the running of the household. The taxpayer there paid the expenses of the home and also his sister's expenses. Upon the evidence there we held, in effect, that the taxpayer's sister had the status of an employee, rather than a dependent. See *Massey* v. *Commissioner, supra*. This is not true in the instant proceeding. It is true that it is stipulated that the petitioner's sister " acted as petitioner's housekeeper." However, the meaning of the word " housekeeper " is not limited to one who is employed (see Webster's New International Dictionary, 1929) ; and the other stipulated facts show that she was not employed by the petitioner. Among other things it is stipulated that during the year in question he was her sole support and maintained her, and that she had no trade or occupation and had no income. Furthermore, the petitioner did employ a servant during the year in question. Under the circumstances we consider it only natural that a feeling of gratitude or an interest in the household would prompt the sister to act as housekeeper. The only inference to be drawn in view of all of the stipulation, covering this point, is that what she did in this respect was done gratuitously. There are numerous facts appearing in the instant proceeding which were not present in *W. E. Massey, supra*, some of which appear from the stipulation herein in part as follows:

\* \* \* Throughout said year, petitioner was, and he still is, the *sole* support of his unmarried sister whom he *maintained* during said year and still *maintains* in the household at said address *at petitioner's expense*. Petitioner's said sister is 55 years old, and during 1929 *had no trade or occupation, had no income* and acted as petitioner's housekeeper. It is, and was during 1929 *necessary for petitioner to employ a servant.* \* \* \*

---

[7] Section 216 (c) of the Revenue Acts of 1918, 1921, 1924 and 1926; section 25 (c) of the Revenue Acts of 1928 and 1932; and section 25 (b) (1) of the Revenue Act of 1934.

In our opinion the stipulated, facts are sufficient to overcome the presumption in favor of the respondent's determination that the petitioner was not, in 1929, the head of a family. See *Helvering* v. *Taylor*, 293 U. S. 507.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

SEAWELL concurs in the result.