JOHN H. WATSON, JR., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 89671. Promulgated October 26, 1938.

*Robert W. Wheeler, Esq.*, for the petitioner.
*W. H. Payne, Esq.*, for the respondent.

1028

## OPINION.

LEECH: It is admitted that petitioner has sustained a loss of his investment in the stock of the Trust Co. and his interest in the Cleveland Corporation. The first issue here raises only the question of whether he is entitled to deduct this admitted loss in either of these companies, in the computation of his income tax for 1934. He

has that right if, and only if, such loss was sustained in that year by reason of that investment then becoming worthless. Revenue Act of 1934, sec. 23 (e).

The time when a loss is sustained is generally fixed by some closed and completed transaction, but both the statute, *supra*—see *United States* v. *White Dental Manufacturing Co.*, 274 U. S. 398—and Regulations 86, article 23 (e)–1, permit the deduction of losses fixed by the occurrence of other identifiable events. Thus, if the worthlessness of petitioner's investment in the Trust Co. and the Cleveland Corporation was "fixed by identifiable events"[1] which happened in 1934, he is entitled to the disputed deduction. Whether it was so fixed is a question of fact, *John B. Marsh*, 38 B. T. A. 878, the answer to which requires the application of a practical, not a legal, test. *Lucas* v. *American Code Co.*, 280 U. S. 445. To be deductible in 1934, this loss must be fixed by events which would satisfy neither "an incorrigible optimist", *United States* v. *White Dental Manufacturing Co.*, *supra*, nor a confirmed pessimist. Although these events need not be ascertained by the taxpayer to support a deductible loss, *Alfred Hafner*, 31 B. T. A. 338, they must be such events as would clearly evidence to the person of average intelligence, under the circumstances, that no probability of realization of anything of value from this investment, by sale, liquidation, or otherwise, thereafter existed. *Royal Packing Co.* v. *Commissioner*, 22 Fed. (2d) 536; *William E. Metzger*, 21 B. T. A. 1271; *George H. Horning*, 35 B. T. A. 897.

Respondent argues that petitioner's investment in both the Trust Co. and the Cleveland Corporation became worthless in 1933, because of events occurring in that year. As to the Trust Co. stock, he points to the series of events then happening, including the successive appointments of a conservator, then a liquidator, and culminating in the report of that liquidator published December 30 and 31, 1933, and January 1, 1934, in the Cleveland newspapers.

Petitioner answers that none of these occurrences clearly evidence the absence of probability of later realization on this stock. He contends the final report of the liquidator filed in July 1934, showing the status of the Trust Co. as of January 31, 1934, and the assessment of the stockholders' liability immediately made upon the basis of the recommendation accompanying that report, were the events which "fixed" the loss.

Since the issue is entirely factual, its decision must, of course, rest upon the facts disclosed by the present record. Other cases may be helpful, but none, so far as we have found, are controlling here.

---

[1] Regulations 86, art. 23 (e)–1, *supra.*

Neither the appointment of a conservator nor that of a liquidator "fixed" the loss here. *Jarvis* v. *Heiner*, 39 Fed. (2d) 361; *Burnet* v. *Imperial Elevator Co.*, 66 Fed. (2d) 643; *W. W. Hanly*, 6 B. T. A 613; *Oscar K. Eysenbach*, 10 B. T. A. 716. The bank was the largest in Cleveland. So far as was then known, it was solvent. The book value of its assets then exceeded its liabilities by a margin of about 25 percent. Its only disclosed difficulty was the disproportionate depletion of its cash and liquid assets to other assets. Attempts at reorganization and reopening were continuing with the open encouragement of the state banking department. No assessment of the shareholders' liability was then made. Certainly, then, nothing happened in 1933 which eliminated the reasonable probability that petitioner would realize something from this stock, unless it was the "interim report" of the liquidator during the last day of that year.

In viewing the picture as a whole, instead of intimating a finding of insolvency, we think this "interim report" shows rather that the liquidator, at the close of 1933, had real doubt on that question. It must be remembered that under Ohio law,[2] the Superintendent of Banks of Ohio was charged with the duty of enforcing stockholders' liability upon ascertainment of its insolvency. The immediate responsibility of ascertaining the condition of the bank and, if insolvent, to recommend the assessment of the stockholders' liability, either partial or entire, rested primarily upon the liquidator. He made no recommendation after his "interim report." In fact, he never filed that report with the superintendent of banks of the state. It was abandoned for all purposes relating to any determination of the bank's then insolvency. Whatever the intent prompting it, the liquidator of the bank, the person in closest touch with its financial position and who issued the report, refused *himself* to accept it. He did not then recommend the assessment of any part of the shareholders' liability. It was not then assumed as it was in the case of other banks which were insolvent. Thus, unless we improperly ascribe to the liquidator a dereliction in his duty, he must have then believed the bank solvent. A necessary practical complement of that premise is that, at the close of 1933, the author of this "interim report" who, the taxpayer, as a man of average intelligence, had a right to assume, knew the actual financial condition of the bank, undoubtedly permitted the implication that he thought something of value would probably be realized by the stockholders from their stock. It follows, we think, that such report can not have operated as an event eliminating a reasonable hope of realization upon this stock. See *Henning Bruhn*, 11 B. T. A. 809.

Although of no controlling influence here, it may be interesting to note that the respondent has recognized as the general rule of ad-

---

[2] Ohio General Code, sec. 710–95.

ministration, in such cases, that the assessment of the shareholders' liability "fixes" their stock loss.[3] In fact, that was the administrative position taken here by respondent as disclosed in a letter to shareholders of the Trust Co. early in 1934, advising that nothing had yet occurred fixing the loss on such stock. Indeed, at the direction of the collector of internal revenue at Cleveland, who was then familiar with the "interim report", two radio broadcasts were made early in 1934, pointedly advising shareholders of the Trust Co. to the same effect. It is now indicated that, for some unexplained reason, this administrative position was changed and published in 1935.

Failure, as here, to show sales of this stock during 1933, undoubtedly tends to show absence of market value for this stock in that year. *Mark D. Eagleton*, 35 B. T. A. 551; affd., 97 Fed. (2d) 62. But we do not consider it decisive in the present circumstances, on the question of reasonableness of petitioner's hope of realizing from the liquidation of this stock at the end of that year. Considering only the record before us, we think the effect of that evidence, as well as the burden of proof, has been overcome by petitioner.

Petitioner's loss in the stock of the Trust Co. was "fixed" by the report of the liquidator of July 1, 1934, as of January 31, 1934, his accompanying recommendation, and the assessment of the shareholders' liability immediately pursuant thereto. Cf. *W. C. Coleman*, 31 B. T. A. 319; affd., 81 Fed. (2d) 455.

Respondent contends that petitioner's interest in the Cleveland Corporation also became worthless in 1933. He attempts to support this conclusion upon the premise that the Trust Co. stock then became worthless and the further fact that, at the end of 1933, the loans of the Cleveland Corporation from the Trust Co. were undercollateralized.

But we have found that the Trust Co. stock did not become worthless until 1934. And, if the claim of the Cleveland Corporation that securities, then held by it, were purchased for and should be taken over by the Trust Co. and credited against its loans from that company at their cost to the Cleveland Corporation, were proved, the loans of the Cleveland Corporation from the Trust Co. were not undercollateralized. At the close of 1933, the balance sheet of the Cleveland Corporation showed assets of $68,168.76 over and above its liabilities, and in this balance sheet the pledged assets, representing the greater portion of its total holdings, were not included at cost but at their market value. In view of that fact and its then undecided claim against the Trust Co., this record reveals no event, either in the beginning of its liquidation, or otherwise, which "fixed" peti-

[3] I. T. 2617 XI-1 C. B. 129; I. T. 2843 XIV-1 C. B. 77.

tioner's loss of his investment in the Cleveland Corporation during 1933. *William H. Redfield*, 34 B. T. A. 967; *William E. Metzger*, *supra; W. W. Hanly, supra.*

However, in May 1934 the liquidator of the Trust Co., by virtue of the power of sale contained in the notes of the Cleveland Corporation, sold out the collateral for the loans evidenced by those notes. This collateral constituted almost all of the assets of the Cleveland Corporation except its claims with reference to the securities, above mentioned, consisting of Trust Co. stock and Chagrin Falls Banking Co. stock. This forced sale eliminated all reasonable probability of holders of interests in the Cleveland Corporation realizing anything on their investments therein, even though the contention of the Cleveland Corporation as to the Trust Co. stock and the Chagrin Falls Banking Co. stock held by it, was sustained. This is so, since the result of that sale of the pledged securities of the Cleveland Corporation was the definite insolvency of the Cleveland Corporation. That forced sale was the event, therefore, which "fixed" the petitioner's loss of his investment in Cleveland Corporation. Petitioner's loss of his cost of that investment was sustained in 1934 and we have so found.

Our decision that petitioner's stock in the Trust Co. and interests in the Cleveland Corporation became worthless during 1934, eliminates the necessity of deciding whether the loss could be allocated. See *Stanley Hagerman*, 34 B. T. A. 1158.

The remaining issue is whether respondent was correct in denying petitioner a credit of $2,500 against his net income, under section 25 (b) (1) of the Revenue Act of 1934, as the "head of a family." Respondent has allowed a credit to the extent of $1,000, on the ground that petitioner was a single person, not the head of a family.

The cited section grants the credit to the head of a family but does not define that term. The wording of this provision is the same as that appearing in prior revenue acts. Respondent has construed it consistently in his regulations. Thus, article 25–4 of Regulations 86, issued in connection with the Revenue Act of 1934, which applies here, construed the term as follows:

A head of a family is an individual who actually supports and maintains in one household one or more individuals who are closely connected with him by blood relationship, relationship by marriage, or by adoption, and whose right to exercise family control and provide for these dependent individuals is based upon some moral or legal obligation. * * *

This consistent interpretation of the language by regulation, with its continued use unchanged in succeeding revenue acts, gives the regulation the force and effect of law. *Maryland Casualty Co.* v. *United States*, 251 U. S. 342. Upon this ground we sustained the

regulation as correctly construing the statute in *Alfred E. Fuhlage*, 32 B. T. A. 222. See also *Louise C. Ball*, 16 B. T. A. 785, and *Joseph H. Rudiger*, 22 B. T. A. 204; *Olive Ross*, 37 B. T. A. 928.

It is true he expended approximately $5,000, in the taxable year, from his income because of his mother's residence with him. However, it is also apparent that his mother was possessed of an estate in excess of $100,000 and had a yearly income of more than $3,000. Obviously, petitioner's mother was not financially dependent upon him within the meaning of the regulation.

We sustain the respondent on this issue. *Louise C. Ball*, *supra*.

*Decision will be entered under Rule 50.*