**HIRSCH et al. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 9812.

Circuit Court of Appeals, Ninth Circuit.

Nov. 29, 1941.

Robert T. Jacob and Samuel B. Weinstein, both of Portland, Or., for petitioners.

Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch, Bernard Chertcoff, and Warren F. Wattles, Sp. Assts. to the Atty. Gen., for respondent.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

Although the questions involved on this petition for review are quite clearly defined, by reason of the fact that only one issue is common to all the petitioners and each taxpayer does not raise every question, it is deemed expedient to dispense with a general statement of facts, and to set forth separately the facts relating to each question along with the discussion of that question. The petition for review charges that the Board of Tax Appeals erred in deciding that there were deficiencies in the income tax, in the case of L. B. Hirsch, for the

years 1935 and 1936, and in the case of Max S. and Clementine Hirsch, for the year 1935. The petitioners Max S. and Clementine Hirsch are husband and wife, and filed a joint income tax return for the year in question.

### The Stock Transfer.

During 1935 and 1936, Max S. Hirsch and L. B. Hirsch were president and vice-president, respectively, of the Hirsch-Weis Manufacturing Co., a corporation engaged in the business of manufacturing and selling work and sports clothes, canvas materials, and related lines, with its principal place of business at Portland, Oregon. The Hirsch-Weis Manufacturing Co. (hereinafter referred to as the Company), was incorporated under the laws of the state of Oregon in 1912, with an authorized capital stock of $100,000, divided into 1000 shares of common stock on a par value of $100 each. Of the original issue Max S. Hirsch subscribed and paid for 600 shares; L. B. Hirsch, 160 shares; Clara Behrens, sister of Max S. and L. B. Hirsch, 40 shares; H. A. Weis, 100 shares; and E. A. Gerst, 100 shares. On or about December 20, 1920, the authorized capital stock of the Company was increased to $700,000 (7,000 shares of $100 par value each), and a 500 per cent. stock dividend was declared and paid. At about the same time seven shares of stock were issued to a son of Max S. Hirsch, thirty-four shares to a nephew and twelve shares to a niece, the consideration for these latter shares not appearing. The following is a statement of ownership, as of 1920 and as of 1935:

| Stockholder: | Shares owned: | |
| --- | --- | --- |
| | Dec. 21, 1920 | Dec. 20, 1935 |
| Max S. Hirsch | 3600 | 3600 |
| L. B. Hirsch | 960 | 1000 |
| H. A. Weis | 600 | 634 |
| E. A. Gerst | 600 | 598 |
| Clara Behrens | 240 | 74 |
| H. Minsch | 34 | 34 |
| E. Doering | 12 | 12 |
| H. Hirsch | 7 | 7 |
| Total | 6053 | 5959 |

For several years prior to 1935 it had been the practice of both Max S. and L. B. Hirsch to borrow large sums of money from the Company, borrowing both on promissory note and open account, paying interest on the sums so borrowed, and from time to time to discharge their obligations by repayment of the loans, some payments, if not all, being made out of dividends received from the Company. On May 6, 1932, Max S. Hirsch owed no money on notes to the Company; by January 1, 1935, he was indebted to it in the sum of $47,-100. Max S. Hirsch's indebtedness to the Company was increased in the remainder of the year 1935 to $58,010.51 on December 20, 1935, of which $41,100 was represented by promissory notes, $13,123.10 was on open account, $1,287.41 was accrued interest, and $2,500 represented a note of a third party which Max had assumed. On January 1, 1929, L. B. Hirsch owed no money to the Company on promissory notes; by December 14, 1935, he was indebted to it, on his notes, in the sum of $14,186.18.

Prior to June, 1934, the Company made a practice of borrowing operating funds from banks at interest rates ranging from five to six per cent. In 1934 it began selling its commercial paper through brokers, and was able to secure the much more favorable rates of one to one and one-quarter per cent. The marketing brokers requested an audit of the Company's books by certified public accountants, and as a result of the audit, the auditors recommended that the loans to stockholders appearing on the Company's books be liquidated in order to protect the Company's financial rating.

On or about December 21, 1935, an informal meeting of the directors for the Company was held, at which it was decided that Max S. and L. B. Hirsch should liquidate their indebtedness to the Company by turning in to it at par value of $100 a share, ten per cent. of the stock they held in the Company, and the other stockholders were granted the same privilege, that is, of turning in ten per cent. of their stock holdings at $100 a share. On December 21, 1935, Max S. turned in 500 shares of stock and L. B. Hirsch surrendered 100 of his shares of stock, in partial liquidation of their loans. In the Company's books closing journal entries were made under date of December 31, 1935, showing a debit of $62,-600 to "Treasury Stock" and a credit of a like amount to "General Ledger," with the notation "To take up charges from General Ledger." Also there was a debit to "Capital Stock" of $62,600 and a corresponding credit to "Treasury Stock," with the notation "To show cancellation of Stock." Twenty-six shares were turned in by two other stockholders in 1935, and in subsequent years additional shares were surrendered by other stockholders under the same arrangement.

No minutes of this informal directors' meeting of December 21, 1935, were made or written at the time, but some years later a recitation purporting to be minutes of said meeting was prepared and inserted in the Company's records. ›After setting forth the date and place of the meeting and the presence of the directors, this writing went on to recite that there was no way the two Hirschs could pay off their indebtedness excepting to sell to the corporation a part of their respective holdings of shares in the corporation. The plan, as heretofore outlined, was set forth and, following this, it was stated that inasmuch as Max S. Hirsch's indebtedness was in excess of ten per cent. of his holdings in the Company, he should be accorded the privilege of surrendering an additional four per cent. of his holdings, or a total of fourteen per cent., in order to pay the complete indebtedness of Max S. Hirsch to the Company.

The Company had substantial net earnings in every year from 1914 through 1935, except the depression years of 1930, 1931, and 1932, when losses were shown. No dividends had been declared or paid since 1928, although there were net earnings in four of the intervening years. There were listed on the balance sheets of the Company undivided profits on December 31, 1933, of $86,322.54; 1934, of $125,891.17; and 1935, of $150,924.34. The corporate by-law on "Dividends" as originally written provided that "A dividend of not less than six per centum of the par value of the capital stock of the corporation shall be declared annually by the Board of Directors. * * *" Max Hirsch, on a date prior to the hearing before the Board, on his own responsibility, changed the word "shall" to "may" by striking out the former word and inserting the latter, with pen and ink. On the hearing Max said the change was made fully ten years prior thereto, but the certified public accountant who audited the Company's books said that the by-law read "shall" at the time he made his audit in 1935.

In his income tax return for 1935 Max S. Hirsch reported the surrender of his stock, in payment of his indebtedness to the Company, as a capital transaction. The Commissioner determined the transaction constituted a redemption or cancellation of such stock by the Company within the meaning of Section 115(g) of the Revenue Act of 1934.[1] L. B. Hirsch did not report the transaction at all in his return, and for failure to do so the respondent assessed a fraud penalty of 50% under § 293(b) of the Revenue Act of 1934, 48 Stat. 680, 747, 26 U.S.C.A. Int.Rev.Code, § 293(b).

The Board of Tax Appeals found that the redemption of the stock was at such time and in such manner as to make the redemption essentially equivalent to the distribution of a taxable dividend and that the failure of L. B. Hirsch to report the transaction was not due to fraud with intent to evade tax.

■ In the consideration of this case, as in other litigation of a kindred nature, it must be borne in mind that the ruling of the Commissioner has "the support of a presumption of correctness, and the petitioner has the burden of proving it to be wrong" before the Board. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212; Allen v. Commissioner, 1 Cir., 117 F.2d 364, 365. The Board's decision indicates that, in its judgment, petitioners did not overcome this burden.

■ The courts uniformly have held that the question whether a distribution in connection with the cancellation or redemption of stock is essentially equivalent to the distribution of a taxable dividend is one of fact. Commissioner v. Babson, 7 Cir., 70 F.2d 304, 306; Randolph v. Commissioner, 8 Cir., 76 F.2d 472, 476; Commissioner v. Champion, 6 Cir., 78 F.2d 513, 514; Brown v. Commissioner, 3 Cir., 79 F.2d 73, 74. It is almost axiomatic that the determination of questions of fact by the Board of Tax Appeals must be accepted on review if there is substantial evidence to support its conclusion. Helvering v. Kehoe, 309 U.S. 277, 279, 60 S.Ct. 549, 84 L.Ed. 751; Phillips v. Commissioner, 283 U.S. 589, 600, 51 S.Ct. 608, 75 L.Ed. 1289; Randolph v. Commissioner, supra. In looking to this question—whether there is substantial evidence to support the finding of the Board

---

1 Section 115(g) of the Revenue Act of 1934, 48 Stat. 680, 712:

"Redemption of stock. If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend." 26 U.S. C.A. Int.Rev.Code, § 115(g).

—we rehearse a few facts outlined above, which lend authority to the Board's finding and control our action.

It is significant, in the examination into the sufficiency of the evidence to support the Board's finding, that we find the Company enjoyed substantial net earnings in all years, 1914 through 1935, excepting the three depth of the depression years; that it declared a 500% stock dividend in 1920; that no dividends were declared or paid after 1928, in spite of net earnings in four of those years and regardless of the mandate of the by-laws requiring an annual declaration of dividend;[2] that the former "borrowings" and interest were paid with dividends received from the Company; that there was no substantial alteration in the control of the two major stockholders as a result of redemption of the stock; that there was a sufficient surplus on the corporate books to justify payment of a dividend, at least to the amount here involved.

 It is argued by petitioners, however, that the transaction was entered into for a legitimate business purpose, namely, to guarantee to the Company favorable interest rates on its borrowings; that the redemption privilege was not extended to any other stockholders in 1935; that there were no extraordinary profits present for distribution in 1935, and the surplus was made up largely of inventory; that not every redemption and cancellation of stock is equivalent to distribution of a dividend. These contentions readily may be answered. As to the first, "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596, 97 A.L.R. 1355; In Smith v. United States, 3 Cir., 121 F.2d 692, 695, 696, it is laid down that "the bona fides in a company's capitalization of its earnings is immaterial to the applicability of Section 115(g). If the stock is cancelled or redeemed 'at such time and in such manner' as to make the cancellation or redemption essentially equivalent to a distribution of earnings or profits * * * the distribution is taxable as a dividend. Such is the express requirement of Section 115(g) 'whether or not such stock was issued as a stock dividend.' The statute is aimed at the result. The basic criterion for the application of Section 115(g) is 'the net effect of the distribution rather than the motives and plans of the taxpayer or his corporation.' Flanagan v. Helvering, [73 App.D.C. 46], 116 F.2d 937, 939, 940." Cf. Hill v. Commissioner, 4 Cir., 66 F.2d 45, 47. As to the next contention, it is immaterial that the distribution may not have been extended to all shareholders, or divided among stockholders other than in proportion to their respective holdings. Lincoln Nat. Bank v. Burnet, 61 App.D.C. 54, 63 F.2d 131, 133. The suggestion that there were no profits present in 1935 out of which distribution could, or should, be made, that is, that the surplus was made up largely of inventory and the amount of cash on hand would be insufficient to meet a dividend, is also unavailing, for the item "Notes receivable" on the balance sheet represented the cash already in the hands of petitioners. Compare, also, Flanagan v. Helvering, supra, and Patty v. Helvering, 2 Cir., 98 F. 2d 717. Lastly it may be said that while it is true that not every redemption or cancellation of stock is equivalent to a distribution of a dividend, the Board held that this one was, and there is evidence to support its finding.

Furthermore, we take occasion to add that the argument that the redemption or cancellation was for the purpose of improving the financial standing of the Company is not impressive. No improvement is disclosed in the balance sheet after the transaction which accomplished a reduction of current assets and a corresponding reduction of proprietorship. If anything, the balance sheet equation disclosed a less healthy condition by reason of the lessening of the total assets.

 It was stated by the Circuit Court of Appeals for the Eighth Circuit, in Wiese v. Commissioner, 93 F.2d 921, 922, that "if the stockholder borrows money from the company, and subsequently the company cancels the debt, income accrues to the stockholder at the time when the character of the withdrawal changes from a loan to a distribution of profits." Again, another Circuit, the First, may be quoted as saying, "The corporation had a large surplus, accumulated out of earnings or profits, available for the distribution of dividends. It is settled that withdrawals by stockholders giving rise to debts, under the circumstances here disclosed, are taxable to the stockholders as dividends in the year in

---

2 Out of surplus profits, of course. § 25-219, Oregon Code.

which the indebtedness is cancelled by the corporation." Allen v. Commissioner, 1 Cir., 117 F.2d 364, 368.

It is our opinion that the Commissioner must be sustained on this question. See, generally, Goldstein v. Commissioner, 7 Cir., 113 F.2d 363; Hudson v. Commissioner, 6 Cir., 99 F.2d 630; Hyman v. Helvering, 63 App.D.C. 221, 71 F.2d 342. The Circuit Court of Appeals for the Second Circuit, in Patty v. Helvering, 98 F.2d 717, and Commissioner v. Quackenbos, 78 F.2d 156, seems to take a different view of the statute than we do when it holds that if the redeemed shares are issued bona fide, § 115(g) never applies, but we think reason, as well as the weight of authority, is on our side. The petitioner urges that the decision of the Board in Bona Allen v. Commissioner, 41 B.T.A. 206, is in conflict with the Board's decision in the instant case, and should control, but, as we have pointed out heretofore in Rogers v. Commissioner, 9 Cir., 103 F.2d 790, 793, "other things being equal, one decision of the Board is entitled to as much weight as another, and we are not advised that the case was reviewed." Moreover, most of the cases arising under § 115(g) "are of little value in the determination of the question instantly presented, for the reason that each depends for its solution upon its own peculiar facts." McGuire v. Commissioner, 7 Cir., 84 F.2d 431, 432.

### The Bad Debt Deduction.

In 1925 Max S. Hirsch loaned Leo W. Seller, his brother-in-law $15,000, which Seller invested in the firm of Garde-Seller Co., and engaged in the business of manufacturing women's house dresses in Seattle, Washington. Seller gave Max Hirsch his promissory note, and his stock in the company as security for the loan. Interest on this note was paid regularly to September 1, 1930, but nothing was paid by Seller on the principal. In 1932 the Leman-Seller Manufacturing Co. (successor to Garde-Seller Co.) became insolvent and was placed in liquidation. Seller turned over his share of the proceeds from the liquidation to Max Hirsch to apply on the note. Owing to the presence of accounts receivable among the assets of Leman-Seller, liquidation thereof continued through 1932, 1933, and 1934. In 1932, Hirsch received $4,155, and applied the same against the Seller note; in 1933, $1318.84; in 1934, $10 was received between Janaury 1 and April 4, $36.92 between April 5 and July 25, and $10 between July 26 and October 15. Thereafter, no further payments of principal or interest were received by petitioner. May 9, 1934, the law firm in charge of the liquidation of Leman-Seller advised Max Hirsch that "The only remaining assets are collection items of uncertain value. * * *" On November 9, 1935, Max wrote the firm of lawyers as follows:

"On May 9, 1934 you advised me that there was some remaining assets of uncertain value which Mr. Schermer agreed to describe in a letter to you and to divide the net recoveries three-eights as collected.

"I have never heard about these remaining assets up to date either about all of them or any part so I would appreciate it if you would investigate and advise if there is any possible chance for any additional recoveries.

"My loss in advancing or loaning money to Mr. Seller is not yet ascertained and as I wish to do so by the first of the year so that I can take my loss into consideration when making up my income tax statement, I would appreciate it if you would write me in detail.

"Be kind enough to word your letter in such a way that the Federal State and Tax Commission do not question the deduction of my loss nor do they take the position that this loss should have been charged off the year previous.

"I am sure you will understand to what I refer and thank you in advance."

The answer to this request stated that the Mr. Schermer referred to had never rendered a report although addressed in this connection on five occasions between October 12, 1934, and August 17, 1935, and concluded with saying, "Under the circumstances, we believe that you may consider that no further recovery will be forthcoming."

From 1932 to the latter part of 1935, when he suffered a slight stroke, Seller worked as a traveling salesman, and had net earnings of from $2,400 to $2,800 a year. Although able to return to his work after several weeks, Seller never fully recovered his health. Seller possessed a home in Seattle which he had purchased on an undisclosed date, but probably prior to 1930, for $10,000, on down payment and mortgage contract. As near as can be ascertained from the record, Seller owed something over $6,000 on the mortgage in

1934; he had the home on the market at $8,000 in attempting to sell it in that year, but was unsuccessful. In 1938 the mortgage was foreclosed and Seller lost the property. At that time the principal was more than he owed originally, presumably increased by failure to pay the interest as it accrued.

It is the law "that the extent of allowable deductions from gross income for the purpose of income taxation is dependent upon legislative grace; that only as there is clear provision therefor can any particular deduction be allowed; and that, therefore, a taxpayer claiming a deduction must be able to point to an applicable statute and show that he comes within its terms." A. Giurlani & Bro. v. Commissioner, 9 Cir., 119 F.2d 852, 854.

Debts ascertained to be worthless and charged off within the taxable year were allowed as deductions in computing net income under the 1934 Act. 48 Stat. 680, 689, § 23(k), 26 U.S.C.A. Int.Rev.Code, § 23 (k) (1).

The Commissioner determined that no deductible loss was sustained by the petitioners Max S. and Clementine Hirsch in the year 1935 on account of the worthlessness or uncollectibility of the balance of the debt due from Seller, and before the Board this determination was afforded the presumption of correctness, and the burden of proving it wrong rested with the taxpayers. The Board held that petitioners failed to overcome this presumption of correctness. The only question of law presented here is whether the Board's finding is supported by substantial evidence. The most that may be said of petitioners' efforts to overcome the presumptive correctness of the Commissioner's determination, is that conflicting inferences could be drawn from the evidence, but "To draw inferences, to weigh the evidence and to declare the result was the function of the Board." Helvering v. National Grocery Co., 304 U.S. 282, 294, 58 S.Ct. 932, 938, 82 L.Ed. 1346.

Hirsch received substantial sums out of the liquidation of the Leman-Seller assets in 1932 and 1933 but received only $56.92 up to October 15, 1934, and nothing thereafter. Inasmuch as these assets consisted in part, at least, of accounts receivable, it would seem that a reasonable man might conclude they had been, for all practical purposes, exhausted. This conclusion finds support in the attorneys' letter of May 9, 1934, which advised the petitioners that the remaining assets were "collection items of uncertain value." Furthermore, Seller was employed, from 1932 to the latter part of 1935, as a traveling salesman, and although he had net earnings of from $2,400 to $2,800 in 1934, he never paid anything on his indebtedness. In the circumstances, the Board did not err in concluding the slight stroke suffered by Seller late in 1935 was not an event to fix worthlessness of the debt. It also appears, as set forth above, that the so-called "equity" of $2000 which Seller claimed in his home in 1934 did not disappear in that year nor in 1935, for the foreclosure did not take place until 1938. There was not sufficient change of circumstance to make the debt any more worthless in 1935 than in 1934, and the letter of Max Hirsch, quoted above, might well indicate that he knew this, also. The taxpayers, therefore, were no more justified in charging off the debt in 1935 than in the preceding year. The following language from Avery v. Commissioner, 5 Cir., 22 F.2d 6, 7, 8, 55 A.L.R. 1277, is applicable:

"* * * The reasonable interpretation of the law is that, in order to secure a deduction of worthless debts, they must be charged off in the year they are ascertained to be worthless. A man is presumed to know what a reasonable person ought to know from facts brought to his attention. A taxpayer should not be permitted to close his eyes to the obvious, and to carry accounts on his books as good when in fact they are worthless, and then deduct them in a year subsequent to the one in which he must be presumed to have ascertained their worthlessness."

We must hold that the Board's finding was supported by substantial evidence.

### The Claimed Exemption as Head of a Family and Claimed Deduction for Dependents.

In his income tax returns for 1935 and 1936, L. B. Hirsch claimed a personal exemption of $2,500 as head of a family and a credit of $1,200 for three dependents. The Commissioner allowed the petitioner only a personal exemption of $1,000 and disallowed the claimed credit for dependents.

Since 1922 the petitioner, who was unmarried, had resided with his sister, Eda H. Low, her husband, Julius Low, and their daughter, Barbara, in their home in Port-

land, Oregon. The three latter persons were, in 1935, of about the ages, respectively of 55, 60, and 15 years. The home in which they resided was purchased by petitioner and deeded to his sister as a gift in 1922. The property was mortgaged in 1932 or 1933 to secure a loan to petitioner of $10,000, which he subsequently paid off. During the years 1935 and 1936 petitioner contributed $350 or $400 a month to the general expense of maintaining the household in which he and the others resided, and, in addition, paid medical bills of the different members of the household and Barbara's educational expenses.

Julius Low suffered from a permanent impairment of his eyesight and confined his employment to peddling wines and cigars to his friends, earning between $400 and $500 a year. In his return for 1935 the petitioner reported $463.42 as income earned by Julius Low in that year.

The Hirsch Investment Company, a corporation organized in 1911 with a capital stock of $20,000 (200 shares of a par value of $100 each) was owned by L. B. Hirsch, Eda Low and Julius Low. As of December 31, 1935, the capital stock of the corporation having meanwhile been reduced to $5,000 (50 shares of a par value of $100 each), the petitioner owned 27.5 shares, Julius Low 18.75 shares, and Eda Low 3.75 shares, of Hirsch Investment Co. stock. The corporate balance sheet as of December 31, 1935, read as follows:

| Assets | | Liabilities | |
|---|---|---|---|
| Cash | $ 562.28 | Notes payable | $20,000.00 |
| Accounts receivable | 28,492.13 | Capital stock | 5,000.00 |
| Land | 4,632.82 | Surplus | 32,934.60 |
| Building | 29,597.80 | | |
| Depreciation reserve | (5,350.43) | | |
| Total | $57,934.60 | | $57,934.60 |

The item "Accounts receivable" included $20,688.71 owed to the corporation by L. B. Hirsch; $1,031.70 owed by Julius Low; and $6,387.92 owed by the stockholders jointly and charged to "Stockholders Joint Account." This latter amount represented moneys withdrawn by the stockholders jointly and used by them, in whole or in part, for general household purposes. The net earnings of the corporation in 1935 were $869.78 and in 1936, $979.52.

At the close of 1935 petitioner was indebted to his sister, Eda H. Low, in the amount of $9,241, on which interest was credited for that year. In addition, Mrs. Low received a quarterly dividend of $41.10 in 1935 on some stock held by her.

█ In the years here in question, the revenue acts [3] allowed as deductions a personal exemption of $2,500 in the case of the head of a family, and a credit of $400 for each person dependent upon and receiving his chief support from the taxpayer if such dependent person was under eighteen years of age or incapable of self-support because mentally or physically defective. Although the statute does not define the words "head of a family," the Regulations [4] interpret the phrase to mean "an individual who actually supports and maintains in one household one or more individuals who are closely connected with him by blood relationship, relationship by marriage, or by adoption, whose right to exercise family control and provide for these dependent individuals is based upon some moral or legal obligation." Fuhlage v. Commissioner, 32 B.T.A. 222, 229, declared this regulation to be a fair interpretation of the statute.

As in the first two questions raised on this petition to review, the ruling of the Commissioner was presumptively correct; the petitioner had the burden before the Board; the Board found against the taxpayer and sustained the Commissioner; and if there is any substantial evidence to sustain the finding of the Board, the finding must be upheld. See cases heretofore listed.

█ While the generosity of petitioner in assisting his less fortunate relatives to maintain a good standard of living is to be commended, we are not justified on the evidence, however, in setting aside the considered decision of the Board. It must be obvious in the outline of facts we have set forth, that there was substantial evidence to support the Board's ruling. Let us consider a few aspects of the factual situation. First, Eda H. Low owned the residence—true, it was a gift of petitioner, but, nevertheless, Eda owned it. This property must have been worth considerably more than $10,000 to have been accepted as security for a mortgage in that amount. Secondly, the petitioner was indebted to

[3] Section 25(b), (1) and (2) Revenue Act of 1934, 48 Stat. 680, 693, 26 U.S.C.A. Int.Rev.Acts, page 677; Section 25(b), (1) and (2) Revenue Act of 1936, 49 Stat. 1648, 1663, 26 U.S.C.A. Int.Rev.Acts, page 835.

[4] Art. 25-4, Regulations 86; Art. 25-4, Regulations 94.

Eda Low for more than $9,000. Thirdly, L. B. Hirsch owed the Hirsch Investment Corporation over $20,000, and the Lows owned 45% of the stock of this Corporation. It cannot be said that persons owning a home of the value of the Lows' home and possessing credits to the above amounts are actually dependent, especially in view of the fact that Julius had a small income and that the Corporation had net earnings in both years. A single person is not entitled to an exemption as the head of a family where the members of the household, to the support of which he contributes, are not actually dependent upon him for support or have independent means thereof. Ellis v. Commissioner, 5 Cir., 110 F.2d 954; Watson v. Commissioner, 38 B.T.A. 1026, 1036; Walton v. Commissioner, 37 B.T.A. 620, 623; Ball v. Commissioner, 16 B.T.A. 785; Kingsley v. Commissioner, 11 B.T.A. 296; Morrow v. Commissioner, 9 B.T.A. 448, 450; Stratton v. Commissioner, 5 B.T.A. 1025.

Other factors to be considered, which bolster the Board's decision, are that there was no showing petitioner exercised, or had the right to exercise, family control over the group and that petitioner would have to live somewhere and to do so would in itself necessitate considerable expenditures, so that all the sums expended by him may not be allocated as petitioner contends.

On the question of dependents no sufficient showing was made to cause us to upset or overthrow the finding of the Board. Cf. Mack v. Commissioner, 37 B.T.A. 1101, 1104, 1105.

The decisions of the Board of Tax Appeals are affirmed.